876 F.2d 1470
 Robert Lacy PARKER, Petitioner-Appellee, Cross-Appellant,
v.
Richard L. DUGGER, Secretary, Florida Department of
Corrections, and Robert A. Butterworth, Attorney
General, State of Florida,
Respondents-Appellants, Cross-Appellees.
 No. 88-3189.
 United States Court of Appeals,
Eleventh Circuit.
 June 19, 1989.
 
 Henri Cawthon, Asst. Atty. Gen., Dept. of Legal Affairs, Mark C. Menser, Tallahassee, Fla., respondents-appellants, cross-appellees.
 Robert J. Link, Jacksonville, Fla., for petitioner-appellee, cross-appellant.
 Appeals from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, FAY and VANCE, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 This is an appeal from the district court's judgment granting Robert Lacy Parker's petition for habeas corpus relief. We reverse.
 
 I. FACTS
 
 2
 This case involves three murders committed in Duval County, Florida on February 6-7, 1982.[1] Parker, then a drug dealer, was known to have a violent temper and to possess several firearms. The day the murders began, Parker became irritated because many of his customers were not paying their accounts. He decided to reinforce his reputation as a tough dealer and began by throwing a rope over a tree limb and threatening to hang Tommy Groover, one of his distributors, if the debts were not paid. The next day Parker again threatened to kill Groover if he did not recover the money. Taking Parker at his word, Groover set out with Billy Long, another of Parker's acquaintances, to collect some of the debts. They first stopped at a local nightclub. There they found Richard Padgett, who was behind in his drug debts, with his girlfriend, Nancy Sheppard. The two men persuaded Padgett and Sheppard to accompany them to Parker's trailer, where Parker and his ex-wife, Elaine Parker, were waiting.
 
 
 3
 When the group arrived at the trailer, Parker took Padgett outside for a "discussion." A shot was fired. When the two came back inside, Parker had a pistol in his belt. Sheppard became alarmed and offered her necklace and ring to Parker as payment for Padgett's debt. Parker refused Sheppard's offer; instead, Long drove her home. The rest of the group accompanied Padgett as he tried to collect money to pay his debt. When he was unsuccessful, Padgett was taken to a junkyard owned by Parker's father. At the junkyard, Groover beat Padgett. Thereafter, the group drove to a secluded rural area. The three men exited the car and Padgett fell to his knees and begged for mercy. With Parker's aid, Groover shot Padgett to death and Parker and Groover threw his body in a ditch.
 
 
 4
 Parker, Groover, and Elaine cleaned up at the junkyard and drove to a bar where they met Jody Dalton, Groover's former girlfriend. Ms. Dalton decided to accompany them. The group first stopped to throw the murder weapon into a river. Dalton witnessed this act. Next, they returned to Parker's trailer and dropped Dalton off while the rest of the group drove to the residence of Joan Bennett. When they returned with Ms. Bennett, Parker became angry because Dalton had used some of his drugs without his permission. Parker and Groover decided to "get rid" of Dalton and drove the entire group to an area known as Donut Lake. There Dalton was stripped, taunted, beaten, and kicked as she begged for mercy. Groover, again with Parker's aid, shot Dalton to death. The two men tied up her body with rope and concrete blocks and threw it into the lake.
 
 
 5
 During the trip back, Parker and Groover discussed killing Bennett because she had witnessed the Dalton murder. Elaine convinced the two men that Bennett could be trusted and they drove Bennett home. The three concluded, however, that Sheppard could link them to Padgett's murder and decided to kill her. They first found Long, who directed them to Sheppard's home. Elaine then tricked Sheppard into accompanying the group by telling her that Padgett was "high" and wanted to see her.
 
 
 6
 The group soon arrived at the scene of the Padgett murder. Parker took Long to the ditch and asked him if he knew what was going on. When he replied that he did not, Parker told him that "either you kill Nancy or I will kill you."[2] Next, Parker took Sheppard to the ditch. Upon seeing Padgett's body, she fell to the ground and exclaimed "Oh, my God!" Elaine handed Long a pistol and said, "You better do it or he'll kill you too." Long took the pistol and shot Sheppard in the head. Parker and Groover screamed, "Shoot her again, she's still breathing." Long shot her twice more. Parker then cut her throat with a knife and took her necklace and ring.
 
 II. PROCEDURAL HISTORY
 
 7
 The State of Florida charged Parker by amended indictment with three counts of first degree murder. Count one charged Parker for the murder of Padgett, count two for the murder of Sheppard, and count three for the murder of Dalton. Parker and Groover were tried separately. Parker's trial began on February 28, 1983. Long and Bennett, among others, testified against Parker. Parker also testified, claiming that Groover orchestrated the murders and had threatened to harm Parker's family if he did not cooperate. The jury rejected this version of the facts and on March 9, 1983, found Parker guilty of first degree murder for the deaths of Padgett and Sheppard and third degree murder for the death of Dalton.
 
 
 8
 During the sentencing phase the state presented evidence of statutory aggravating circumstances, see Fla.Stat.Ann. Sec. 921.141(5) (West 1985), and Parker presented evidence of both statutory mitigating circumstances, see id. Sec. 921.141(6), and nonstatutory mitigating circumstances. The evidence presented by Parker included the testimony of six witnesses (his mother, grandmother, neighbor, cousin, sister, and minister), each testifying to some redeeming qualities in Parker's character.
 
 
 9
 The jury recommended that Parker receive life sentences for the murders of Padgett and Sheppard. The trial judge overrode the jury's recommendation as to count two, the murder of Sheppard, and sentenced Parker to death. The judge wrote detailed findings as to the statutory mitigating and aggravating circumstances present during the murder. He found no statutory mitigating circumstances[3] and six statutory aggravating circumstances.[4]
 
 
 10
 Parker appealed and the Florida Supreme Court affirmed. Parker v. State, 458 So.2d 750 (Fla.1984), cert. denied, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985) [hereinafter Parker I ]. The court held that the trial judge had erred in finding that two of the statutory aggravating circumstances were present.[5] The court nevertheless held that the remaining four statutory aggravating circumstances sufficiently outweighed the mitigating circumstances to justify the trial court's decision to override the jury's recommendation. The court specifically held that the trial judge's override complied with the standard announced in Tedder v. State, 322 So.2d 908 (Fla.1975), which mandates that a trial judge may override a jury's recommendation of life only when "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Id. at 910, cited in Parker I, 458 So.2d at 754.
 
 
 11
 Parker thereafter moved under Fla.R.Crim.P. 3.850 to vacate the judgment and sentence. The trial judge denied the motion and the Florida Supreme Court affirmed. Parker v. State, 491 So.2d 532 (Fla.1986) [hereinafter Parker II ]. Parker then filed a federal habeas petition. The court considered and rejected twelve grounds for relief,[6] but granted relief on one ground. Respondents appeal and Parker cross appeals.
 
 III. RESPONDENTS' APPEAL
 
 12
 The district court granted relief on the following ground raised in Parker's habeas petition:The Florida Supreme Court has adopted such a broad and vague construction of the Tedder standard of review of jury overrides as to result in the arbitrary, capricious, and disproportionate application of the death penalty.
 
 
 13
 Respondents contend that the district court erred. We agree.
 
 
 14
 In Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), the Supreme Court exhaustively examined the constitutionality of Florida's override scheme. The Court first examined the constitutionality of schemes in which a trial judge may impose the death penalty alone, without any input from a jury. Id. at 457-65, 104 S.Ct. at 3160-65. After concluding that such schemes are not per se unconstitutional, the Court likewise concluded that schemes in which the trial judge may impose the death penalty after receiving an advisory verdict of life from a jury are not per se unconstitutional. Id. at 465, 104 S.Ct. at 3165.
 
 
 15
 The Court then examined the particular override scheme used by the State of Florida and concluded that, in general, Florida's scheme is constitutional. The Court was persuaded by two aspects of the scheme that render it unlikely that the Florida courts will impose the death penalty in an arbitrary or discriminatory manner. First, several Florida procedural rules, of both statutory and case law origin, constrain trial judges from imposing the death penalty in an arbitrary or discriminatory manner. Among these significant safeguards is Sec. 921.141(3) of the Florida Statutes, which requires trial judges to independently review the evidence and make detailed written findings regarding aggravating and mitigating circumstances before imposing the death penalty. Spaziano, 468 U.S. at 466, 104 S.Ct. at 3165. Another significant safeguard accorded capital defendants is the Tedder standard. Id. at 465, 104 S.Ct. at 3165. Second, the meaningful appellate review by the Florida Supreme Court in every capital case further reduces the likelihood that the death penalty will be imposed in an arbitrary or discriminatory manner. That court is required by law to review every death sentence to ensure that it has not been imposed arbitrarily or capriciously. Id. at 466, 104 S.Ct. at 3165 (citing Fla.Stat. Sec. 921.141(4)). The Court noted that there has been no evidence that the Florida Supreme Court has failed to execute its responsibility faithfully, id. at 466, 104 S.Ct. at 3165, or hesitated to reverse a trial judge who has derogated the jury's role by failing to comply with the mandates of Tedder, id. at 465, 104 S.Ct. at 3165. Thus, not only are Florida trial judges provided with procedural rules to aid them in performing their duty in a constitutional manner, the likelihood that they will succeed in ignoring these rules or incorrectly following them is reduced significantly by meaningful appellate review.
 
 
 16
 The Court's conclusion that Florida's override scheme is constitutional did not end its inquiry. Procedures that result in the constitutional application of the death penalty if followed correctly may result in the unconstitutional application of the death penalty if followed incorrectly. The Court therefore examined the record of the particular case before the Court and concluded that the application of Florida's scheme did not result in the arbitrary or discriminatory application of the death penalty. See id. at 466, 104 S.Ct. at 3165 ("We see nothing that suggests that the application of the jury-override procedure has resulted in the arbitrary or discriminatory application of the death penalty, either in general or in this particular case.") (emphasis added).
 
 
 17
 As in Spaziano, the present case involves the application of Florida's override scheme. Because the Court in Spaziano upheld the general constitutionality of the scheme, we need not re-examine this issue. Rather, we must examine the application of these procedures in this case. We conclude that the application of Florida's override scheme in the present case did not result in the arbitrary or discriminatory imposition of the death penalty.
 
 
 18
 The district court decision suggests that its grant of relief was influenced by dissatisfaction with the Florida Supreme Court's application of the Tedder standard to the facts in this case. Spaziano warns, however, that federal review for the arbitrary or discriminatory imposition of the death penalty must not devolve into second-guessing the Florida courts on questions of state law, particularly on whether the trial judge complied with the mandates of Tedder:
 
 
 19
 Our responsibility ... is not to second-guess the deference accorded the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory.
 
 
 20
 Spaziano, 468 U.S. at 465, 104 S.Ct. at 3165. The district court's opinion characterized the ground upon which it granted relief as alleging "that the trial judge's decision to impose a sentence of death over the jury's recommendation of life imprisonment violated the protections accorded to him by Tedder v. State and its progeny." The fact that the court interpreted this to be issue before it, and granted relief in response, suggests that the court granted habeas relief for the wrong reason.
 
 
 21
 We nevertheless must uphold the district court's decision if the record supports the conclusion that the death penalty was imposed in an arbitrary or discriminatory manner. Nothing in the record, however, supports such a conclusion. The district court noted that the trial judge did not make specific written findings with respect to the presence of nonstatutory mitigating circumstances and interpreted this silence as manifesting a conclusion that nonstatutory mitigating circumstances were not present. The court held that the presence of nonstatutory mitigating circumstances was fairly supported by the record and therefore the failure to find the presence of such circumstances rendered Parker's death sentence invalid. See Magwood v. Smith, 791 F.2d 1438, 1449-50 (11th Cir.1986) (cited in district court's opinion). Our court, however, has rejected the theory that a trial judge's failure to make specific written findings concerning nonstatutory mitigating circumstances raises the inference that he did not consider such evidence in reaching the decision to impose the death penalty. See Johnson v. Wainwright, 806 F.2d 1479, 1484 n. 8 (11th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987).[7] In addition, no inference can be drawn from the trial judge's silence that he did not find nonstatutory mitigating circumstances to be present. Under the facts of this case the only reasonable conclusion is that the trial judge found at least some mitigating factors to be present, but also found that they were outweighed by the aggravating factors also present. In his sentencing order, the judge wrote that "[t]here are no mitigating circumstances that outweigh the aggravating circumstances in ... the second count (Sheppard murder)." (emphasis added)
 
 
 22
 The district court also noted that the Florida Supreme Court has overturned jury overrides in other cases in which more statutory aggravating circumstances were present than in this case. Under Florida law, however, the sentencing process in capital cases is more than a simple calculation of the number of aggravating circumstances:[T]he procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.
 
 
 23
 State v. Dixon, 283 So.2d 1, 10 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974). The federal constitution does not require that it should be. See Barclay v. Florida, 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134 (1983) ("We have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors."); see also Spaziano, 468 U.S. at 466, 104 S.Ct. at 3165 (jury override upheld even though only two aggravating factors present). The fact that there were "only" four statutory aggravating circumstances present during the Sheppard murder hardly compels the conclusion that the death penalty was imposed in an arbitrary or discriminatory manner.
 
 
 24
 Another concern of the district court was that the trial judge imposed a sentence of death for the murder of Sheppard but not for the murder of Padgett. The court concluded that the different sentences resulted from a perceived difference in the victims. The court reached this conclusion because the trial judge, in his sentencing order, referred to Sheppard in sympathetic terms as "the innocent and unsuspecting young Nancy" and "the helpless 17 year old girl." We think it is unreasonable to assign a discriminatory motive to a trial judge merely because he referred to the victim of a brutal murder in sympathetic terms. Trial judges cannot be expected to divorce from themselves all human emotion merely because a trial is at hand. As the Supreme Court stated in Barclay, "[i]t is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences." Barclay, 463 U.S. at 950, 103 S.Ct. at 3425. The district court's conclusion also ignores at least three aggravating circumstances present during the Sheppard murder that were not present during the Padgett murder: (1) the Sheppard murder was the third murder that day, while the Padgett murder was the first, (2) Parker cut Sheppard's throat to make sure the job was done, and (3) he murdered her to prevent her from identifying him as the murderer of Padgett. The evidence supports our conclusion that the trial judge gave Parker different sentences because the totality of the circumstances surrounding the two murders were different, rather than because of a perceived difference in the victims.
 
 
 25
 A state imposes punishment arbitrarily "when, without reason, if inflicts upon some people a severe punishment that it does not inflict upon others." Furman v. Georgia, 408 U.S. 238, 274, 92 S.Ct. 2726, 2744, 33 L.Ed.2d 346 (1972) (Brennan J., concurring). A state imposes punishment in a discriminatory manner when "it discriminates against [the defendant] by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices." Id. at 242, 92 S.Ct. at 2728 (Douglas, J., concurring). We have reviewed the record and conclude that the imposition of the death penalty in this case falls into neither category.
 
 IV. THE CROSS APPEAL
 
 26
 Parker contends that the district court erred in concluding that eleven of his grounds for habeas relief have no merit.[8]
 
 A. Procedural Bar
 
 27
 One of these grounds is a claim under Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).[9] Respondents contend that this claim is procedurally barred from federal habeas review. We agree. A defendant who is procedurally barred in state court from raising a federal constitutional claim also is barred from raising the same claim in a federal habeas petition unless he can show cause for and actual prejudice from making the default. Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The record reflects that Parker did not raise a Stromberg claim before the original trial court or on direct appeal to the Florida Supreme Court. He also did not raise the claim in his Rule 3.850 motion to the trial court or in his appeal to the Florida Supreme Court of the denial of the motion. Parker does not dispute that the failure to present the Stromberg claim to the Florida courts[10] constitutes procedural default under Florida law, nor does he attempt to show justifiable cause for making the default. He instead attempts to rely on an exception to the rule of procedural bar to the effect that the rule does not apply if the state courts have chosen not to enforce their own procedural default rule by deciding a claim on its merits. See Dobbert v. Strickland, 718 F.2d 1518, 1524 (11th Cir.1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984).
 
 
 28
 Parker first points to language from the Florida Supreme Court's opinion disposing of his direct appeal, in which the court stated that "[i]n addition to considering all other issues raised on appeal, we have conducted an independent review of the record o[f] trial and find no reason to award a new trial." Parker I, 458 So.2d at 754. We do not agree that the supreme court thus indicated that it not only had chosen to decide the claims that were presented to the court on their merits, but also all conceivable claims that might have been presented to the court. Fla.R.App.P. 9.140(f) requires that "[i]n capital cases, the court shall review the evidence to determine if the interest of justice requires a new trial, whether or not insufficiency of the evidence is an issue presented for review." With the exception of challenges to the sufficiency of the evidence, we cannot accept the contention that the Florida Supreme Court would interpret Rule 9.140(f) as obviating, for capital defendants, the traditional requirement that appellants must present to the reviewing court all issues for which relief is sought.
 
 
 29
 Parker cites Harris v. Reed, --- U.S. ----, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), for the proposition that, despite his failure to present a Stromberg claim to the Florida courts, we must presume that those courts chose to ignore the procedural default because they have never "plainly stated" that Parker's Stromberg claim is procedurally barred. As applied in this case, however, Harris does not stand for such a proposition.
 
 
 30
 The defendant in Harris raised an ineffective assistance of counsel claim in a petition for postconviction relief before the state trial court. Id. at ----, 109 S.Ct. at 1040. The trial court denied the claim and the Appellate Court of Illinois affirmed in an unpublished decision in which it noted that the defendant had not raised an ineffective assistance claim in his previous direct appeal to the appellate court and that it was a "well-settled" principle of Illinois law that " 'those issues which could have been presented [on direct appeal], but were not, are considered waived.' " Id. The court nonetheless went on to consider and reject the defendant's ineffective-assistance claim on its merits. Id.
 
 
 31
 Although it was unclear in Harris whether the Appellate Court of Illinois rejected the petitioner's claim for procedural reasons or on its merits, there was no doubt that the claim was presented to the court and therefore the court had the opportunity to reject the claim for procedural reasons. After analyzing the competing policy considerations at stake, the United States Supreme Court held that federal habeas courts must presume that, in the absence of a plain statement to the contrary, the state court elected to waive procedural default and decide, on its merits, any claim presented to the court:
 
 
 32
 [A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar.
 
 
 33
 Id. at ----, 109 S.Ct. at 1043 (quoting Caldwell v. Mississippi, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985)).
 
 
 34
 When a claim was never presented to the state courts, however, as in the present case, the policy considerations discussed in Harris render it unreasonable to presume that the state courts waived procedural default. Justice O'Connor, in her concurring opinion in Harris, analyzed this situation in detail and reached the same conclusion:
 
 
 35
 [It] would make no sense ... [to] require a "plain statement" indicating state reliance on a procedural bar where no state court was ever given the opportunity to pass on either the procedural posture or the merits of the constitutional claim.
 
 
 36
 Id. at ----, 109 S.Ct. at 1047 (O'Connor, J., concurring). We find Justice O'Connor's rationale persuasive and therefore conclude that Parker's Stromberg claim is procedurally barred from federal habeas review.[11]
 
 B. Requested Instructions
 
 37
 Parker contends that he is entitled to habeas relief because his requests for certain jury instructions were denied.[12] He first asserts that he was entitled to the following instruction, which proposed the duress defense to the Sheppard murder:
 
 
 38
 One of the defenses asserted in this case is that the defendant participated in the alleged offense under duress; that is, that he was forced to participate in the offense alleged. In order to constitute a defense, the co-ercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done.
 
 
 39
 It is assumed that every person's actions are free from duress, absent evidence to the contrary. However, once some evidence of duress has been brought before the jury, the burden is upon the State to prove beyond a reasonable doubt that the defendant did not act under duress.
 
 
 40
 Parker argues that the trial judge erred as a matter of Florida law in denying this instruction and cites several federal cases holding that a state trial judge can violate a defendant's right to due process by committing an error of state law in denying a requested jury instruction. See, e.g., United States ex rel. Reed v. Lane, 759 F.2d 618 (7th Cir.1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986).
 
 
 41
 Parker asserts that the state relied on the felony murder doctrine to obtain his conviction for murdering Sheppard. He also argues that under Florida law duress is a defense to felony murder and therefore he was entitled to have the instruction delivered. We need not decide whether these assertions are correct because the state also relied on an intentional murder theory to obtain Parker's conviction. Under Florida law, duress is not a defense to intentional murder. Wright v. State, 402 So.2d 493, 498 (Fla.Dist.Ct.App.1981); Cawthon v. State, 382 So.2d 796, 797 (Fla.Dist.Ct.App.), petition for rev. denied, 388 So.2d 1110 (Fla.1980). The requested instruction therefore is misleading because it implies that duress is a defense to either felony murder or intentional murder. A Florida trial judge does not err by refusing to give an erroneous instruction. Barwicks v. State, 82 So.2d 356, 358 (Fla.1955); Halfrich v. State, 165 So. 285, 288-89 (Fla.1936). Consequently, we conclude that the trial judge properly denied the requested instruction under Florida law and correspondingly did not violate Parker's right to due process.
 
 
 42
 Parker also contends that he was entitled a jury instruction that he could not be found guilty of murdering Padgett if the killing was the independent act of Groover. The Florida Supreme Court, on direct appeal, rejected this contention because it did not find any evidence on the record that would support the instruction. See Parker I, 458 So.2d at 752. The district court, citing Cabana v. Bullock, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), held that this conclusion is presumed to be correct.
 
 
 43
 The district court misinterpreted Cabana. That case held that a federal court reviewing a case for a violation of Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (death penalty may not be imposed on one who has neither killed, attempted to kill, or intended that a killing take place or lethal force be employed), must not focus exclusively on the instructions given to the jury. Cabana, 474 U.S. at 387, 106 S.Ct. at 697. Rather, the court must examine the entire course of the state proceedings to determine whether the requisite factual finding as to the defendant's culpability has been made. Id. If it has, the finding must be presumed correct by virtue of 28 U.S.C. Sec. 2254(d) unless the habeas petitioner can bear the heavy burden of overcoming the presumption. Id. at 387-88, 106 S.Ct. at 697-98.
 
 
 44
 Under Cabana, therefore, findings by state judges sometimes may cure deficient jury instructions concerning the sentence a defendant is to receive. As the Court carefully noted, however, findings by state judges cannot cure deficient jury instructions concerning the elements of the crime itself:
 
 
 45
 Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime.
 
 
 46
 Id. at 384-85, 106 S.Ct. at 696. Consequently, the district court erred in presuming the correctness of the Florida Supreme Court's finding that the evidence was insufficient to support an independent act instruction. We nevertheless have independently reviewed the record and have determined that the evidence was insufficient to support an independent act instruction. The district court therefore did not err in refusing habeas relief on this ground.
 
 C. Remaining Issues
 
 47
 The remaining issues Parker raises on appeal warrant little discussion. Three of these issues relate to conduct by the prosecution.[13] First, Parker alleges that the prosecution violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose evidence favorable to the defense. The district court, applying the three-part test of United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), found that there was not a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. We have examined the record and conclude that this finding is not erroneous. Second, Parker alleges that the prosecution violated Parker's constitutional right to counsel by asking him during cross-examination whether he had been coached by his counsel during a recess. Subject to the control of the trial judge, however, the prosecution may cross-examine a defendant as to the extent of any coaching that may have occurred during a recess. Geders v. United States, 425 U.S. 80, 89, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592 (1976). Third, Parker alleges that several remarks made by the prosecution were improper, prejudicial, and inflammatory. We agree with the district court that the comments were invited by defense counsel's own heated comments during opening summation. The district court summed it up correctly:
 
 
 48
 [T]he rhetoric from both sides was a lively exchange, often heated in the choice of words. The jury, properly instructed, can be expected to have understood the weight to accord the arguments. Petitioner's trial may not have been perfect, but due process does not depend upon perfection.
 
 
 49
 The evidence of guilt was overwhelming in this case and the trial judge cautioned the jury not to use the arguments of counsel as evidence. We are convinced that the prosecution's comments did not " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (citation omitted).
 
 
 50
 Parker's final contentions concern several evidentiary rulings by the trial judge.[14] Parker is not entitled to habeas relief unless the rulings denied him a fundamentally fair trial. Hall v. Wainwright, 733 F.2d 766, 770 (11th Cir.1984), cert. denied, 471 U.S. 1107, 105 S.Ct. 2344, 85 L.Ed.2d 858 (1985). We have reviewed the record and agree with the district court that the alleged errors neither individually nor cumulatively rendered Parker's trial fundamentally unfair.
 
 V. CONCLUSION
 
 51
 Our review of the record reveals that Parker was not deprived on his constitutional right to a fair trial. The district court's judgment granting Parker habeas corpus relief therefore is
 
 
 52
 REVERSED.
 
 
 
 [1]
 The facts are taken from the trial judge's written findings of fact as contained in his sentencing order. Parker does not allege the presence of any of the eight grounds for challenging these factual findings that are listed in 28 U.S.C. Sec. 2254(d); therefore, the state trial judge's factual findings are presumed correct
 
 
 [2]
 Long had good reason to fear Parker; Parker had been imprisoned once for shooting Long
 
 
 [3]
 The trial judge expressly found that the following statutory mitigating circumstances, as specified in Fla.Stat.Ann Sec. 921.141(6) (1985), were either not present or carried no weight:
 (a) The defendant has no significant history of prior criminal activity.
 (b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
 (c) The victim was a participant in the defendant's conduct or consented to the act.
 (d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.
 (e) The defendant acted under extreme duress or under the substantial domination of another person.
 (f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
 (g) The age of the defendant at the time of the crime.
 
 
 [4]
 The trial judge found the following statutory aggravating circumstances to be present:
 (1) Parker was previously convicted of a felony involving the use of or threat of violence to the person.
 (2) The capital felony was committed while Parker was engaged, or was an accomplice, in the commission of, or an attempt to commit, a robbery.
 (3) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest.
 (4) The capital felony was committed for pecuniary gain.
 (5) The capital felony was especially heinous, atrocious, or cruel.
 (6) The capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
 See id. Sec. 921.141(5).
 
 
 [5]
 The court held that the murder of Sheppard was not committed during a robbery, nor was it especially heinous, atrocious, or cruel. Parker I, 458 So.2d at 754
 
 
 [6]
 The district court considered and rejected the following grounds asserted by Parker: (1) His conviction for murdering Sheppard was obtained by instructing the jury on a theory of liability, the felony-murder rule, that was unsupported by the evidence. (2) The trial judge improperly refused to grant Parker's requested jury instruction as to the Sheppard count that duress is a defense to felony-murder. (3) The trial judge improperly refused to grant Parker's requested jury instruction that he could not be found guilty of murdering Padgett and Dalton if the murders were the independent acts of Groover. (4) The prosecution failed to reveal evidence favorable to the defense in the form of payments to state witnesses, despite repeated requests by the defense for this evidence, and actively denied its existence during trial. (5) The prosecution repeatedly made improper, prejudicial, and inflammatory remarks during the guilt phase summations. (6) The prosecution improperly introduced evidence of collateral acts and crimes of Parker solely to demonstrate Parker's propensity to commit crime. (7) The prosecution improperly cross-examined Parker about his conversations with his trial counsel. (8) The trial judge improperly prohibited Parker from showing the bias of a state witness by questioning her about her probationary status. (9) The prosecution intentionally elicited testimony from a defense witness that Parker had remained silent while in jail. (10) The state offered into evidence statements made by Parker after arrest and without benefit of Miranda warnings. (11) The trial judge improperly allowed into evidence statements made by Parker during an arrest for an unrelated crime and instructed the jury that the statements could be used as evidence of Parker's guilt in the present case. (12) The State of Florida imposed Parker's death sentence pursuant to a pattern of racial discrimination
 
 
 [7]
 The district court also expressed the concern that the trial judge's silence indicated that he did not consider nonstatutory mitigating circumstances before deciding to override the jury's recommendation of life and therefore he may have violated Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). We first note that Parker did not raise a Hitchcock allegation in his habeas petition. In any event, Johnson v. Wainwright answers these concerns. We also note that the trial judge prefaced his written findings with the following statement:
 [T]his Court has carefully studied and considered all the evidence and testimony at trial and at advisory sentence proceedings, the Presentence Investigation Report, the applicable Florida Statutes, the case law, and all other factors touching upon this case.
 (emphasis added). The trial of this case occurred after Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (requiring consideration of nonstatutory mitigating circumstances), was decided and Fla.Stat. Sec. 921.141 was amended to require Florida trial courts to consider nonstatutory mitigating circumstances. Given this and the fact that the trial judge listened to copious evidence of nonstatutory mitigating circumstances presented by Parker during the sentencing phase, we are convinced that the trial judge did in fact consider and weigh nonstatutory mitigating circumstances before deciding to sentence Parker to death.
 
 
 [8]
 Parker does not challenge the district court's holding that habeas ground twelve has no merit. See supra note 6
 
 
 [9]
 Habeas ground one. See supra note 6. Although Parker's habeas petition does not specifically cite Stromberg under habeas ground one, Parker argued this ground as a Stromberg violation in his brief to this court
 
 
 [10]
 Parker asserts that he raised a Stromberg claim in his petition for rehearing of his direct appeal to the Florida Supreme Court. We have examined Parker's petition for rehearing and conclude that he in fact did not present a Stromberg claim in his petition for rehearing
 Even if Parker had argued a Stromberg claim in the motion for rehearing of the direct appeal, we would conclude that the claim is procedurally barred from federal habeas review. After failing to raise the claim on direct appeal, Parker also failed to raise it in his subsequent Rule 3.850 motion. His failure to do so constitutes procedural default under Florida law. See Delap v. State, 513 So.2d 1050 (Fla.1987). When a claim is procedurally barred because the defendant failed to raise the claim to the last state court rendering a judgment in the case, the state court cannot be held to have waived the procedural default, even in the absence of a plain statement indicating that procedural default was not waived. See Harris v. Reed, --- U.S. ----, ---- - ----, 109 S.Ct. 1038, 1046-48, 103 L.Ed.2d 308 (1989) (O'Connor, J., concurring). Thus, we conclude that the Florida Supreme Court, in disposing of the Rule 3.850 motion, did not waive procedural default as to the Stromberg claim.
 
 
 [11]
 We also conclude that dismissing Parker's petition for failure to exhaust administrative remedies is not appropriate. See Harris, --- U.S. at ----, 109 S.Ct. at 1047 (O'Connor, J., concurring) ("[D]ismissing ... petitions for failure to exhaust state court remedies would often result in a game of judicial ping-pong between the state and federal courts, as the state prisoner returned to state court only to have the state procedural bar invoked against him.") (citation omitted)
 
 
 [12]
 Habeas grounds two and three. See supra note 6
 
 
 [13]
 Habeas grounds four, five, and seven. See supra note 6
 
 
 [14]
 Habeas grounds six, eight, nine, ten, and eleven. See supra note 6