James Armando CARD,
Petitioner–Appellant,

v.

Richard L. DUGGER,
Respondent–Appellee.

No. 88–3729.

United States Court of Appeals,
Eleventh Circuit.

Sept. 4, 1990.

Larry H. Spalding, Billy H. Nolas, Thomas R. Dunn, Office of Capital Collateral Representative, Tallahassee, Fla., for petitioner-appellant.

Gary L. Printy, Asst. Atty. Gen., Richard B. Martell, Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before KRAVITCH, HATCHETT and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

James Armando Card, a Florida prisoner sentenced to death, appeals from the district court's denial of his petition for habeas corpus. Card was convicted of robbery, kidnapping, and first degree murder in connection with the death of Janice Franklin, clerk of a Western Union office in Panama City, Florida. On the afternoon of June 3, 1981, the Western Union office was robbed of approximately $1200. Blood was found on the floor and counters of the office, the office safe was slightly ajar, and the cash drawer had been removed and was on the floor. The clerk of the office was missing. Her body was found the next day beside a dirt road in a secluded area 8.4 miles from the Western Union office. Her blouse was torn, her fingers were severely cut and her throat had been cut.

During the days immediately following the discovery of the body, police investigated and ruled out at least thirty persons as potential suspects. Suspicion did not focus on Card until June 8, 1981, when Vicky Sue Elrod, an acquaintance of Card's, informed the police that Card had told her that he had committed the murder. According to Elrod's trial testimony, Card had telephoned her at about 6:30 on the morning of June 3 to tell her that he might be coming

to see her in Pensacola to repay her $50.00 that she had loaned him. At about 5:30 p.m., she received another phone call from the defendant, saying he was coming to Pensacola and needed to see her. At 9:30 that night, Elrod met with Card at a motel in Pensacola. Card took a large stack of bills out of a blue pouch. According to Elrod, she asked Card if he had robbed a convenience store, and he told her that he had robbed a Western Union station and had killed the woman who worked there. Among other things, he described scuffling with the victim, tearing her blouse, and cutting her with his knife. He then said that after taking the money, he took the victim in his car to a wooded area. He had no intention of hurting her until she had gotten out of the car, but then he went behind her and cut her throat, saying "die, die, die" while she was bleeding. He further informed Elrod that the tire prints were the only thing that could connect him to the crime, and asked her to exchange the tires from her car. She also told the jury that Card showed her an old silver dollar that was in the blue pouch. Card was arrested on June 8, 1981.

Elrod was the state's main witness, and it appears that her testimony was the most damaging piece of evidence against Card. The other highly incriminating evidence came from a forensic specialist who testified that tire tracks at the murder scene indicated that a car at the scene had three different types of tires. Casts made from these tracks matched the tread of each of the tires on the defendant's car.

Among other witnesses, the state presented the testimony of two men, Albert Powell and Chris Thomas, who each stated that they thought Card looked like a man that they saw in the Western Union office at around 3:00 p.m. on June 3, 1981. Pow-

ell, however, testified that he saw two men in the Western Union office prior to the offense and refused to swear on oath that the defendant was the man he saw. A policeman testified that two different sets of footprints were found at the scene where the victim's body was located. The footprints were not positively identified as those of the defendant. A forensic serologist, Suzanne Harang, testified that she could not determine whether blood found in Mr. Card's car came from the victim because she could not determine the victim's blood type.

At trial, Card attempted to introduce the testimony of Camille Cardwell (now Camille Payne). The proffer to the trial court indicated that Cardwell would testify that a few weeks before the offense she had heard her boyfriend, John Green, and several of his friends, including Tom Wilmot, planning the robbery of a place "where people sent in money orders." Green and the others planned to commit the robbery between 2:00 p.m. and 3:00 p.m. and planned on using a knife. Cardwell had given the police this information during an interview conducted shortly after the offense. Her testimony was excluded as hearsay.[1]

Card was charged in Bay County, Florida, with first degree murder, robbery, and kidnapping. Venue was transferred to Okaloosa County, where the trial was held. Card was convicted on all three counts, and the jury recommended death by a vote of 7 to 5. The case was returned to Bay County, where Judge Turner, who had tried the case, imposed consecutive sentences of life imprisonment on the robbery and kidnapping convictions, and a death sentence for the first degree murder conviction based on his finding of five aggravating circum-

1. The defense also called, among other individuals: (1) Panama City police officer George Dobos, who was examined regarding a description given to him by Chris Thomas of a man Thomas had seen in the Western Union office; (2) Chris Thomas, who was examined regarding the description he gave the police; (3) Officer Slusser, who was examined regarding the Panama City Police Department's investigation of the crime; and (4) Officer Charles W. Polk, who was examined regarding a report he had written in which he stated that he had driven down the road where the body was found at approximately 7:30 p.m. on June 3, 1981, and that the body was not there and that there was only an old tire track going down the road. All of these witnesses had also testified for the prosecution.

stances and no mitigating circumstances.[2]

On direct appeal,[3] the convictions and sentence were upheld by the Florida Supreme Court. *Card v. State*, 453 So.2d 17 (Fla.), *cert. denied*, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984). Thereafter, Card filed a state petition for a writ of habeas corpus and an appeal from the order of the circuit court denying his motion to vacate the sentence pursuant to Florida Rule of Criminal Procedure 3.850.[4] The Supreme Court of Florida denied all relief. *Card v. State*, 497 So.2d 1169 (Fla.1986), *cert denied*, 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987). Card again petitioned the Florida Supreme Court for a writ of habeas corpus in 1987.[5] The court again denied relief. *Card v. Dugger*, 512 So.2d 829 (Fla.1987). A petition for writ of error coram nobis was also filed and denied. Card thereafter filed the present petition for habeas corpus in the Northern District of Florida asserting the following eight claims:[6]

I. He received ineffective assistance of counsel in the guilt phase of trial;

II. He received ineffective assistance of counsel at the penalty phase of trial;

III. The trial judge erroneously excluded testimony indicating that someone other than Card committed the crime;

IV. His trial and sentencing were conducted before a court lacking jurisdiction under state law;

V. He was denied his right to a pretrial competency hearing, and his right not to undergo criminal proceedings while incompetent;

VI. He received ineffective assistance of counsel on his direct appeal;

VII. The trial judge erred under *Hitchcock* in failing to find and consider statutory and nonstatutory mitigation; and

VIII. Argument, instruction and comment by the prosecutor violated his rights under *Caldwell*.

The district court held an evidentiary hearing on claims I and II only and denied relief on all claims. We address each of Card's claims in turn.

*I. Ineffective Assistance of Counsel at the Guilt Phase of Trial*

■ Claims of ineffective assistance of counsel are evaluated under the two-prong test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

---

**2.** Judge Turner found the following five aggravating circumstances under Fla.Stat. § 921.141(5): (1) the murder was committed while the defendant was engaged in the commission of a kidnapping; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was committed for pecuniary gain; (4) the murder was especially heinous, atrocious, or cruel; and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

**3.** On appeal, Card raised two claims: (1) the trial court erred in excluding the testimony of Camille Cardwell; and (2) the trial court erred in its findings on aggravating and mitigating circumstances.

**4.** Card raised four claims as follows: (1) lack of jurisdiction in the trial court; (2) failure to

conduct a pretrial competency hearing; (3) ineffective assistance of trial counsel at the guilt and penalty phase of trial; and (4) ineffective assistance of appellate counsel for failure to assert that the trial court was without jurisdiction.

**5.** Card raised five claims as follows: (1) a *Hitchcock* claim; (2) ineffective assistance of appellate counsel for failing to challenge the trial court's failure to hold a *Richardson* hearing; (3) a *Caldwell* claim; (4) denial of right to a competency hearing and the right not to undergo trial while incompetent; and (5) exclusion of Camille Cardwell's testimony during the penalty phase.

**6.** In his petition before the district court, claims I and II were combined together as a single claim. Thus, the petition contains only seven claims.

deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064. Under the first prong of *Strickland*, counsel's performance is considered deficient if counsel's acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 689, 104 S.Ct. at 2065.

Card argues that trial counsels Thomas Ingles and Herbert Green[7] were deficient within the meaning of *Strickland* in that they failed to investigate, develop or present to the jury evidence tending to establish their client's innocence and showing that some other person or persons had actually committed the robbery and murder for which Card was convicted and sentenced.

In *Strickland v. Washington*, the Supreme Court stressed that in assessing attorney performance, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted). The Court set out the relationship between adequate investigation and strategic choices as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 104 S.Ct. at 2066. We assess Card's ineffective assistance of counsel claim with these standards in mind.

### A. Failure to Develop and Present the Testimony of Camille Cardwell

Card first asserts that counsel was ineffective in failing to present the testimony of Camille Cardwell at trial suggesting that someone other than Card had committed the robbery and murder. He also claims that counsel was ineffective in failing to investigate and develop leads that might have corroborated Cardwell's testimony.

The police took a statement from Camille Cardwell on June 5, 1981, two days after Franklin's body was discovered. At that time, she informed the police that approximately two weeks before the murder, she had heard three men planning the robbery of a Western Union office in Panama City. In her statement to the police, Cardwell stated that she had left Panama City on the 25th or 26th of May, 1981, and that she had heard nothing else about the robbery until hearing about it on television on June 4, 1981. Although this statement was available to defense counsel prior to trial, counsel did not speak with Cardwell until after the trial had begun.

At trial, after a short discussion with Cardwell, counsel proffered her testimony. At the proffer, Cardwell was asked when she heard the robbery being planned. She again testified that she flew back to Kansas on either the 18th or 19th of May, so she must have heard the robbery planned before that. The proffer was denied as inadmissible hearsay.

In an affidavit sworn in September of 1987, Cardwell stated that when counsel spoke with her during the trial, she attempted to tell him that she had heard John Green and the others planning the robbery on the morning of June 3, 1981. She stated that counsel did not seem interested in this information and told her that he would only

---

7. Although both Ingles and Green participated in the investigation and preparation of the case, Green represented Card at the guilt phase of trial and Ingles represented Card at the penalty phase. For convenience, in discussing each phase of the trial, this opinion will use "counsel" in the singular.

question her regarding her statement to the police. She further stated that she would have told the trial judge more if she had been given the chance.

Cardwell testified at the evidentiary hearing before the federal district court. At that time, she stated that "at the day of the robbery I was not around." She also stated that there was nothing about the plan that she heard that she did not tell the police when questioned shortly after the murder.

Card claims that because counsel had failed to investigate Cardwell's testimony, counsel was unprepared to elicit and use information that Cardwell had seen various persons preparing for the robbery on the morning of the robbery. He argues that Cardwell's account could have been corroborated by other evidence. He points out that Cardwell testified at the evidentiary hearing that the composite drawing made from one witness's description resembled Tom Wilmot. He also points out that there were statements by witnesses Cathy Tew and Peggy Tarbaux that they saw a '62–63 Chevrolet containing three males and a female pull onto the dirt road where the body was found, and that Cardwell had said John Green owned a '62 Chevrolet. In addition, another witness, Anthony Prestigicacomo, told police of a similar car he had seen in the same area on the morning of the day the body was found. Finally, there was evidence that there were two sets of footprints at the scene where the body was found. Card argues that all of this corroborated Cardwell's testimony, but this evidence was not put before the jury at trial. He claims that Cardwell's testimony about observing preparations on the day of the robbery would not have been excluded as hearsay and that it would have created a reasonable doubt in the mind of the jury.

■ We agree with the district court that counsel was not ineffective in failing to investigate further the testimony of Cardwell and to present that testimony at trial. We reach that conclusion, however, on grounds different from those relied upon by the district court.

In holding that counsel was not ineffective for failing to further investigate and to present the testimony of Cardwell, the district court started from the proposition that Card's attorneys knew before trial, from Card's confessions, that he had robbed the Western Union and murdered Janice Franklin. The court pointed to a note in Attorney Ingles's files recording the substance of a jail interview between Ingles and Card on July 2, 1981, at which time Card confessed to the murder. He also noted that on the morning of trial, Card admitted to co-counsel Green that he "cut her [Ms. Franklin's] throat." The court stated that "[i]t is against these admissions that the charge of ineffectiveness of counsel must be weighed." *Card v. Dugger*, No. TCA 87–40243–MMP at 4 (N.D.Fla. July 1, 1988) (hereinafter "Order"). The court found that "[t]he admission absolutely discredited the hypothesis of innocence offered by potential defense witness Camille Cardwell (now Payne) that John Green, Tom Wilmot, and 'Ringo' planned to rob the Western Union office and that John Green later told her that he committed the Western Union robbery." *Id.*

The district court concluded that it would have been unethical for the counsel to attempt to establish Card's innocence by offering testimony that some other persons had committed the crime. Relying on *Williams v. Kemp*, 846 F.2d 1276 (11th Cir.1988), *cert. denied*, ── U.S. ──, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990), the court concluded that counsel could not have presented Cardwell's testimony because to do so would have required him to engage in illegal and unethical conduct. The court further found that trial counsel's failure to develop leads that might arguably corroborate Cardwell's testimony was not ineffective assistance because her evidence could not ethically be produced at trial. It concluded that "rather than being charged with ineffective assistance, counsel should be commended for defending [his] client without recourse to offering knowingly false and misleading testimony to the court." Order at 6.

■ We agree with the court that a claim of ineffective assistance cannot be grounded on the failure of trial counsel to produce false or misleading evidence. The Supreme Court made this clear in *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). In *Whiteside,* the client informed counsel that he would perjure himself on the stand. In determining whether counsel was ineffective for informing his client that he would not aid him in presenting perjured testimony, the Court stated:

> In *Strickland,* we recognized counsel's duty of loyalty and his "overarching duty to advocate the defendant's cause." *Ibid.* Plainly, that duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law.

*Id.* at 166, 106 S.Ct. at 994.

■ Although a claim of ineffective assistance of counsel is generally evaluated by examining the actual motivation for counsel's trial strategy, the district court did not focus on counsel's motivation for failing to present Cardwell's testimony. We hold that this was error under the facts of this case. In a case where counsel's ethical obligations are unambiguous, the reviewing court need not look to trial counsel's actual motivation for failing to present testimony or evidence. Instead, the court may infer that counsel's ethical duty to refrain from certain conduct formed the basis for counsel's decision not to present particular evidence. *See Williams,* 846 F.2d at 1281 (where record reflected that defendant had told counsel

he had written an incriminating note, counsel's decision not to produce contrary testimony merely fulfilled his ethical obligation). This is consistent with the Supreme Court's recognition in *Whiteside,* that "an attorney's ethical duty to advance the interest of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct." 475 U.S. at 168, 106 S.Ct. at 995.

■ In cases where the question of the ethical duty of counsel is open to debate, however, a court reviewing an ineffective assistance of counsel claim should look to counsel's actual motivation for failing to present testimony. If counsel's failure to present testimony was motivated by a belief that an ethical obligation precluded him from doing so and that belief was reasonable, then such conduct may not be considered deficient performance under *Strickland.* If, however, the record demonstrates that trial counsel's failure to present certain evidence may not have been motivated by a perception of his ethical obligations, then the court should not rely on its view of counsel's obligations in deciding an ineffective assistance of counsel claim. This is in keeping with *Strickland*'s mandate that the reviewing court "evaluate the conduct from counsel's perspective at the time [of trial]." 466 U.S. at 689, 104 S.Ct. at 2065.

In this case, the question of whether Green, under the standards of ethical conduct governing attorneys, was in fact precluded from presenting Cardwell's testimony to the jury is debatable. An attorney in Green's position could have reasonably believed that he was not ethically precluded from presenting Cardwell's testimony. First, it appears that Green had good reason to discredit Card's confession.[8] More-

---

**8.** While Card had purportedly told Ingles that he committed the crime, Green testified that Card consistently told him that he was innocent. In explaining why he represented Card in the guilt phase and Ingles represented Card at the penalty phase, Green stated that:

> Early on when Tom first got into it Mr. Card had admitted to him apparently in detail about the robbery and the murder and what had happened. And when I got into the case,

Mr. Card was consistently telling me he didn't do it, so we figured, well, maybe Guy Green can be a little more effective and more persuasive, since Card hadn't actually told me he committed the crime. That's why I ended up doing the guilt phase and Tom ended up doing the penalty phase. Then unfortunately the morning of the trial he ended up telling me he did it, too. I don't know if that made that much difference.

over, even if Green credited Card's confession, it is not clear that the rules governing ethical conduct of attorneys would prohibit him from putting Cardwell on the stand and having her testify that she heard other individuals planning a similar robbery. Thus, this is not a case in which a court, when engaging in a *Strickland* performance prong analysis, should ignore counsel's actual motivation and infer that his actions were based on his ethical obligations.

Turning to Green's motivation, a review of the record convinces us that Green did not feel himself under an ethical duty to refrain from relying on Cardwell's testimony, and we conclude that the district court clearly erred in finding that this was Green's motivation. First, Green *did* attempt to introduce Cardwell's testimony at trial, indicating that he was not being motivated by the ethical duty suggested by the district court, but the testimony was rejected on grounds of hearsay. Moreover, Green stated at the evidentiary hearing that if Cardwell's testimony had been admitted, he would have called witnesses to corroborate it. Finally, Green testified at the evidentiary hearing that he "surely" and "certainly" would have used, relied on, and argued evidence that someone other than Card had committed the offense, if he had such evidence.[9] He also stated that he would have used Cardwell's testimony to argue Card's innocence to the jury. Finally, in closing argument, Green argued that the real killer was the man in the red shirt who was seen by Chris Thomas at the Western Union counter just three or four minutes before the robbery occurred.

Although we determine that the district court erred in holding that Green's failure to investigate and offer Cardwell's testimony was based on his ethical obligations, we conclude that the failure to further investigate or present such testimony did not amount to deficient performance within the meaning of *Strickland*. First, we find that Green did not act unreasonably in failing to interview Cardwell before trial or to investigate leads that he was aware of through her statement given to police. In *Gates v. Zant*, we stated:

> Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense. A reasonably competent attorney often *must* rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense. Consequently, counsel has rendered effective assistance even though he decided not to pursue a particular line of defense without substantial investigation so long as the decision was reasonable under the circumstances.

863 F.2d 1492, 1498 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989).

Green also testified that:
> You know, he had told Mr. Engles [sic] early on that he had committed the crime. And then when I got into it, he is telling me that, no, I didn't do it. And he starts giving me leads, and I am trying to follow them, and they are all wild goose chases, and Engels [sic] is saying you're wasting your time, he's the one that did the thing. And these leads we are talking about, basically these are leads that somebody else committed this crime, and they were just not checking out, because we didn't have anybody else that did it. You can't prove something that didn't happen. And we would try and check them out. No, they just wouldn't go anywhere because you can't prove something that doesn't happen.

It seems that Green was also aware that Card was a pathological liar, whose lies were designed to attract attention and tended to be in the nature of self-enhancement. For instance, Card spoke of killing many men in Vietnam, although he had never been there, and he told stories about shooting police officers, which were apparently false.

**9.** Green stated at the evidentiary hearing that:
> if we could get it in [Cardwell's testimony], we would try to use it during the trial. If we got it in during the trial, we have the same thing essentially on Wilmot, John Green, as the State had on Jim Card. We had some girl saying they were going to do it, and essentially the same evidence. And we would have been able to argue they got—you know, there is a reasonable doubt because of that. If that fails, then, you know, it would be raised on appellate review as to whether or not it was admissible as hearsay, which it was.

Green's files contain Camille Cardwell's statement to the authorities of June 5, 1981, described above. In this statement, Cardwell's testimony was limited to her overhearing a conversation weeks before the incident. This version of events is in accord with her proffer of testimony in state court, where she reiterated that she was not around on the day of the incident. At no time before or at trial did Cardwell inform Green that she had heard certain individuals planning the robbery on the morning of June 3, 1981. We conclude that a reasonably competent attorney in Green's position in January of 1982 would have had no basis to believe that Cardwell possessed any further information and could have reasonably decided that her statement did not warrant further investigation.

As noted above, Green attempted to present Cardwell's testimony, but was unable to do so because of the trial judge's ruling that it was hearsay. Card argues that reasonably competent counsel could have surmounted a hearsay objection by attempting to subpoena Wilmot, Ringo and Green or demonstrating their unavailability or by preparing evidence corroborating Cardwell's account. It is mere speculation, however, that the evidence would have been admitted had counsel demonstrated unavailability or corroboration,[10] and we hold that the petitioner has not carried his burden of showing that Green's inability to get the evidence before the jury amounted

to deficient performance. *Cf. Aldrich v. Wainwright,* 777 F.2d 630, 636 (11th Cir. 1985), *cert. denied,* 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 297 (1986) (speculation insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation).[11]

Green explained that after the trial judge excluded Cardwell's testimony, he decided not to present witnesses Tew and Tarbaux, but instead to present the testimony of Officer Polk, who stated that at 7:30 p.m. on the day that Card was alleged to have committed the crime, he had only seen one tire track on the road and that it was an old track. Green testified that once he had decided to call Polk, it would have made no sense to present either Tew or Tarbaux, as the accounts of those witnesses contradicted Officer Polk's testimony.[12] Green's decision to choose one line of defense over another because of the trial judge's ruling was a reasonable tactical decision that does not raise *Strickland*-type concerns.

B. Failure to Investigate Evidence that Would have Impeached the Testimony of State Witnesses

■ Vicky Elrod was the state's main witness. She testified that Card confessed to her on the evening of June 3, 1981, that he had committed the murder and that he had described to her in great detail what he

10. Florida Evidence Code § 90.804(2)(c) provides:

 (2) **Hearsay Exceptions.** The following are not excluded [as hearsay] provided that the declarant is unavailable as a witness:

 (c) *Statement Against Interest.* A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject him to liability or to render invalid a claim by him against another, so that a person in the declarant's position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement. A statement or confession which is offered against the accused in a criminal action, and which is made by a codefendant or other person implicating both himself and the accused, is not within this exception.

11. Card also argues that Cardwell's testimony, put forth in her 1987 affidavit, as to preparations she witnessed on the day of the robbery would *not* have been excluded as hearsay, and further states that Green did not know about this testimony because he had failed to contact Cardwell prior to trial. It appears, however, from Cardwell's testimony at the evidentiary hearing, that at trial she would *not* have testified to witnessing such preparations. Furthermore, if she had so testified, the state could have impeached her on the basis of her statement given to police on June 5, 1981, in which she said she was not in Panama City on the day of the robbery.

12. According to statements given to police on the afternoon of June 3, 1981, both witnesses had seen a car containing three persons pull into the road where the body was found.

had done.[13] Card claims that defense counsel was aware of information that could have been used to impeach the testimony of Vicky Elrod, but that counsel, through lack of preparation, failed to impeach her. Specifically, he points to the existence of telephone records indicating that certain phone calls from Card to Elrod were made at times different from those testified to by Elrod. In addition, Elrod testified that Card told her that he had gotten the money out of the safe. Counsel did not impeach this statement despite evidence that the money was kept in the cash drawer and not the safe. Further, Elrod testified that Card told her that he had found the victim's wallet on the seat of the car, and there was evidence that the wallet was normally kept in the victim's purse, which had been left at the Western Union station. Finally, counsel did not present evidence regarding Elrod's motive to fabricate her testimony about Card because of her animosity towards him as a result of disagreements during their drug transactions.

Green testified at the evidentiary hearing that he had conducted substantial investigation into Elrod's background, looking specifically for any criminal activity or connection with drug dealing. In addition, the attorney's files contained a lengthy deposition of Elrod taken by Green shortly before the trial at which time Elrod denied ever selling Card marijuana, and denied the existence of any drug debt between them. She also stated at that time that she could have been mistaken about the time of one of the phone calls.

We conclude that at trial, Green conducted a competent cross-examination of Elrod, questioning her about the circumstances surrounding Card's confession and her motives for testifying. We agree with the district court that none of the evidence that petitioner claims could have been introduced directly contradicts or undermines the testimony of Elrod. *See Aldrich v. Wainwright*, 777 F.2d 630, 637 (11th Cir. 1985), *cert. denied*, 479 U.S. 918, 107 S.Ct.

324, 93 L.Ed.2d 297 (1986) (no prejudice where petitioner fails to identify any specific information that would have added to the impeachment of state's witnesses where witnesses were exposed to substantial cross-examination).

■ Card also alleges that counsel failed to investigate or present evidence that would have impeached the testimony of state witnesses Powell and Thomas. On June 3, 1981, witnesses Powell and Thomas gave descriptions to the police of persons they had seen at the Western Union office on the afternoon the crime was committed. Powell's description of one of the two men he had seen did not match the appearance of Card, and Thomas's description, as well as a composite sketch made from that description, did not resemble Card. At trial, Thomas and Powell testified that the man they saw in the Western Union office looked like the petitioner. Powell stated, however, that he could not swear Card was the man he saw because of the passage of time.

Card states that Green acted unreasonably in failing to elicit Powell's prior description in order to point out discrepancies between that description and Card's appearance and in failing to show the composite sketch made from Thomas's prior description to the jury. He argues that this evidence would have established that the person those witnesses saw was not Card.

At the evidentiary hearing, Green made abundantly clear that he did not further investigate or impeach Powell or Thomas because he felt that the testimony of these witnesses did not hurt the defense case, given that their testimony was inconclusive and did not link Card to the victim or the crime. Green stated that weaknesses in the witnesses' testimony were apparent from their direct testimony.

It is clear that Green made a tactical decision not to present the composite nor to impeach Powell based on his assessment of

---

13. Elrod's testimony was particularly convincing because she reported that Card showed her a silver dollar. At the time Elrod gave her initial statement to the police on June 8, 1981, the police had been unaware that the silver dollar was missing; the victim's husband later confirmed that it had been kept in the safe.

the harm of the testimony to the defense case. Green did call Thomas as a witness for the defense and pointed out that there was a discrepancy between the description Thomas gave to police on June 3, 1981 and his testimony at trial. While current counsel may have treated the Thomas and Powell testimony differently, Green's decision at the time of trial concerning the appropriate use of this testimony does not rise to the level of deficient performance required for a showing of ineffective assistance within the meaning of *Strickland.*

■ Card also claims that counsel conducted an insufficient investigation of the state's forensic serology expert. At trial, a state forensic serologist testified that she could not determine the victim's ABO blood type and thus could not say that blood found in Card's car, which was of type B, did not come from the victim. Card points out that in fact, investigators *had* determined that the victim had type "O" blood, and thus it was clear that the blood could not have come from the victim. Although counsel had this report indicating the victim's blood type, the report was not used to impeach the serologist.

We agree with the district court that even if counsel should have impeached the serologist with the report showing blood type, his failure to do so was not deficient performance within the meaning of *Strickland,* as cross-examination at trial was sufficient to show the weaknesses in the witness's testimony. *See Adams v. Wainwright,* 804 F.2d 1526 (11th Cir.1986), *modified,* 816 F.2d 1493 (11th Cir.1987), *reversed on other grounds,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (defense counsel not ineffective for failing to obtain expert pathologist, where defense counsel cross-examined state expert and argued weaknesses in testimony to jury in closing

argument). We note that on cross-examination, the serologist testified that the blood stains in the car could not have come from Janice Franklin, but that they did match the blood of Card's son.

Card's other contentions relating to his ineffective assistance claim involve allegations concerning counsel's failure to utilize certain police reports concerning footprints found at the spot where the victim's body was found, the presence of unknown hairs on the victim's body, and a witness who stated that he saw three men in front of the Western Union shortly before the robbery. Testimony at the evidentiary hearing belies Card's assertion that trial counsel was unaware of exculpatory evidence because he made no effort to investigate the case or to read the discovery materials obtained from the state. *Cf. Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (finding counsel's failure to file a timely suppression motion deficient where counsel was unaware of search that revealed incriminating evidence because he had conducted no pretrial discovery). Although Card's current counsel makes quite clear that had he been trial counsel, the case would have been tried much differently, this is not the test for ineffective assistance. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

In sum, we find that this case bears little resemblance to those in which this court has found that counsel's failure to investigate deprived the defendant of his sixth amendment right to counsel.[14] Card's allegations of attorney neglect are contradicted by the record. His counsel actually performed much of the investigation with which Card fails to credit him, and as to those areas where counsel did not investigate, we find that this was not deficient performance.[15] Because we find that coun-

---

**14.** *See, e.g., Code v. Montgomery,* 799 F.2d 1481, 1482–83 (11th Cir.1986) (failure to ask defendant where he was on day of robbery or to secure alibi witnesses constitutes deficient performance where alibi is sole defense); *Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir. Unit B 1981)* (where insanity was sole defense and defendant had been previously treated at state mental hospital, counsel acted unreasonably in

relying solely on testimony of defendant's wife and mother to prove insanity).

* The Eleventh Circuit, in *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

**15.** Card also notes that shortly before trial, Ingles had indicated that he was not ready to go

sel's performance was not deficient, we do not reach the question of whether Card has demonstrated prejudice.

## II. Ineffective Assistance of Counsel at the Penalty Phase of Trial

Card argues that trial counsel failed to conduct an adequate investigation into his background and history, resulting in the deprivation of powerful evidence in mitigation which could have been used at the penalty phase of trial. He claims that as a result he was denied his sixth amendment right to effective assistance of counsel. *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.

Card argues that counsel was ineffective in two ways: First, counsel failed to call family members to testify as to Card's background. Second, counsel and the mental health experts on whom counsel relied failed to perform an adequate investigation of Card's background, including his medical problems. As a result, despite the testimony of Dr. Hord, the jury was unaware of that background when it made its sentencing recommendation. Card further asserts that counsel's errors were prejudicial because the evidence was clearly mitigating and, had it been presented to the jury that recommended death by a 7 to 5 vote, there is a high probability that the outcome would have been different.

### A. Testimony at the Sentencing Hearing

The only witness to testify during the penalty phase was Dr. James Hord, a clinical psychologist called by defense attorney Ingles, who represented Card during the penalty phase. Dr. Hord testified that in his opinion, Card evidenced a "sociopathic personality adjustment pattern." According to Hord, persons with this behavior pattern react impulsively to stress, show poor long-range judgment, little forethought, and little awareness beyond the immediate situation. Dr. Hord related this diagnosis to the events surrounding the robbery of the Western Union office and the kidnapping and murder of Ms. Franklin. He concluded that by the time the actual decision was made to kill her, the defendant would have been in a state approaching panic, not knowing how to get out of the situation he had gotten himself into. Dr. Hord stated that in his opinion, at the moment of killing, Card was acting under extreme mental or emotional disturbance, and that Card's capacity to conform his conduct to the requirements of law was substantially impaired.

After testifying as to Card's emotional and psychological state at the time of the offense, Dr. Hord testified that in his opinion, the cause of sociopathic behavior can be found in interruptions in the childhood years in the natural identification that normally takes place between an individual and his parents. He then described how Card's history was consistent with the development of a sociopathic personality.[16] Dr. Hord outlined Card's harsh treatment by his natural father and step-father during his early childhood and related specific instances of cruelty. He informed the jury that Card's mother put Card into psychiatric care for a short time at the age of five or six years. Finally, Dr. Hord testified as to the probable effect of a prison term on Card's behavior, stating that it could serve to rid Card of his sociopathic behavior.

forward with the defense. Ingles's request for a continuance was denied. On the day of trial, however, Green withdrew the motion for a continuance and informed the court that he was ready to proceed. At the evidentiary hearing, Green testified that he had received from the state on the day of trial a report indicating the presence of semen and suggesting that the victim might have been raped. Rather than risk the possibility that the state would add a charge of rape if the trial were continued, counsel made the tactical decision to proceed to trial. We cannot say that such a tactical decision was unreasonable under the circumstances. *Cf. Ald-*

*rich*, 777 F.2d at 634 (court finds no prejudice where, despite counsel's statement that he was totally unprepared to try the case, there was in fact significant preparation and investigation prior to trial and counsel vigorously represented his client in court).

16. Dr. Hord also testified that one of the characteristics of sociopaths is that they lie for self-aggrandizement, and that for this reason he did not rely solely on Mr. Card in obtaining the history, but also spoke with members of the family.

Dr. Hord did not mention Card's poor performance in school, his medical history (including records of head injuries), his criminal history as a juvenile and an adult, or his discharge from the Army "for reasons of total unsuitability."

### B. Counsel's Failure to have Family Members Testify

■ We turn first to Card's claim of ineffectiveness due to counsel's failure to call members of Card's family to testify at the sentencing hearing. In evaluating ineffective assistance of counsel claims, this court places particular weight on the trial counsel's explanation of trial strategy, proffered at a state trial court or federal district court evidentiary hearing, provided such a hearing has been held. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (effort must be made to reconstruct the circumstances of counsel's conduct and evaluate conduct from counsel's perspective at the time).

In this case, Mr. Ingles, the attorney who represented Card at the sentencing proceeding, had died in 1987 and was thus not present at the district court's evidentiary hearing. Instead, Mr. Green, who was responsible for the guilt phase of trial and who had worked extensively with Ingles on the case, testified as to his opinion of Ingles's strategy at the sentencing hearing.

Green stated that although he himself did not meet Card's family until the trial, Ingles had been corresponding with them since shortly after the murder. He presented several reasons why, in his opinion, Ingles did not present the testimony of Card's mother, Gloria Chenoweth, and Card's sister, Darla D'Agostino, at the sentencing hearing.

First, Green testified that "Card exhibited a violent-type behavior toward members of his family. We did not want that presented to the jury. We felt like on cross they might get some of that in." Second, he stated that:

Mr. Card had a lot of brushes with the law in the past, and the State had failed to offer any testimony or any evidence to that, and we were concerned about them

getting that in under this type of evidence. We can take the same information, basically the same information about his deprived childhood and all that stuff, and let them—let them feed it to Dr. Hord, which they did, and then let Dr. Hord testify to it. We got the best of both worlds, in my opinion. We get in the deprived childhood syndrome without exposing ourselves to the possibility of ... the prior record and the prior alleged violence, whatever, to his family members. So we got the best of both worlds by not calling the family members themselves, but in getting it in through Dr. Hord.

We find Green's assessment of Ingles's strategy convincing and supported by the record.

This court has held that:

In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. *Thompson v. Wainwright*, 787 F.2d 1447, 1450 (11th Cir.), *cert. denied*, [481] U.S. [1042], 107 S.Ct. 1986, 95 L.Ed.2d 825 (1986) [sic]. The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. *Thompson*, 787 F.2d at 1452. After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." *Mitchell*, 762 F.2d at 899 (quoting *Stanley v. Zant*, 697 F.2d 955, 965 (11th Cir.1983), *cert. denied, sub nom.* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)).

*Lightbourne v. Dugger*, 829 F.2d 1012, 1025 (11th Cir.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Card urges this court to reject Green's testimony concerning the strategic decision made by trial counsel. He states that counsel could not have made any strategic decision as to whether to call family members because counsel did not investigate or prepare for the penalty phase and thus had no basis for making any decisions. In support of this assertion, he points out that the

attorney files do not contain background records, family statements, or other matters relevant to sentencing. The affidavits of Card's mother and sister demonstrate that Ingles never spoke to them until trial. Finally, on the last day of the guilt phase, January 21, 1982, Ingles indicated to the court that Card's mother and sister were present, but stated that he did not know if he wanted to call them because he had no idea what they would say if they testified. Ingles also indicated that he was meeting with Dr. Hord that evening to discuss the penalty phase.

Card makes much of the fact that Dr. Wray's report, describing Card's background on the basis of an interview with family members, could not have possibly influenced counsel's thinking on how to conduct the penalty phase, as it was prepared on January 27, 1982, five days after the penalty phase. Without the testimony of Ingles, we cannot be entirely sure of exactly what information was before him at the penalty phase on January 22, 1982. However, language in Dr. Wray's report suggests that despite its date of January 27, 1982, Ingles was appraised of its contents at the time of the penalty hearing. The report, written in the form of a letter to Judge Turner, states that: "At Mr. Ingles request, I also made a trip to Crestview on January 20, 1982 to specifically evaluate the history of Mr. Card's mother and sister, since Mr. Ingles believed that they may be helpful in producing mitigating circumstances if Mr. Card was found guilty of first degree murder." The letter further states that all data that Dr. Wray received "was verbally transmitted to Mr. Ingles. Therefore the defendant had full benefit of my evaluations." Dr. Wray further stated that "[Ingles] has spent several hours with me going over the copious case material."

Although the letter is dated January 27, 1982, it is reasonable to assume that the data it contains is the same data that was verbally transmitted to Ingles for his use

at the penalty phase of trial. The letter contains the information Dr. Wray received from his interview with Card's mother and sister. In that interview, Card's family confirmed that the defendant had a fairly extensive criminal record. In addition, Dr. Wray reported that "[o]n one occasion, but one occasion only, he became severely angry at his mother and impulsively picked up a table and threw it at her. His sister Darlene [sic] however says he has never been violent with her or her sister, Sandra, who was killed in 1973.... On one occasion he threatened Darlene's husband, Mike, with a knife, but Mike took the knife away from him." Based on Dr. Wray's letter, we find that Ingles was made aware of Card's past violence towards his family.

Although family members did not testify at the penalty phase, as noted above, Dr. Hord did describe Card's difficult childhood to the jury and related this childhood to his diagnosis that Card had a sociopathic personality. Card argues that it would be illogical for counsel to decide to present evidence of family background through Dr. Hord in order to avoid harmful cross-examination because if Dr. Hord knew about Card's violence toward family members and criminal record, he would be subject to the same cross-examination as family members. We find this argument unpersuasive. Counsel could have quite reasonably decided that, on re-direct, a mental health expert could explain how violence and criminal conduct fit into his diagnosis of Card as demonstrating a sociopathic personality and how it was consistent with his troubled childhood.[17] Family members may have been less adept at such explanations.

At the evidentiary hearing, Green further testified that "[Dr. Hord] is involved in community affairs down there [in Panama City] and so forth. And, you know, a lot of people know Dr. Hord. He really makes a good impression with the jury, and he is very—appears to be very competent."[18] This court consistently has re-

17. The state did not, in fact, cross-examine Dr. Hord on these matters.

18. Green also stated that:

I have had a lot of experience with Dr. Hord. He has been very good to the Defense Bar in our area, and we like to use him. He is a very, very effective speaker, and he comes

fused to second-guess counsel's choice of the manner in which to present testimony relating to a defendant's background. Thus, in *Lightbourne,* the court concluded that counsel's decision, after an adequate investigation, to rely on the defendant's testimony to show a turbulent family history rather than offering the testimony of defendant's family members was a reasonable strategic choice. 829 F.2d at 1025–26. We have also held that counsel may decide whether to rely on the testimony of experts or lay witnesses in putting evidence before a jury. *See Foster v. Dugger,* 823 F.2d 402, 407 (11th Cir.1987), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988) (decision to rely on lay testimony and to avoid the excessive use of medical evidence was reasonable); *Daugherty v. Dugger,* 839 F.2d 1426 (11th Cir.), *cert. denied,* 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988) (same).

Card argues that the generalized, skeletal account of Card's upbringing offered by Dr. Hord was completely inadequate to inform the jury of the neglect and abuse he suffered in his childhood and youth, and did not portray the effects on his behavior and development of what he had suffered.[19] He contends that more detailed testimony would have presented a compelling and humanizing portrait which would serve to explain Card's behavior.

We conclude that there were sound tactical reasons for Ingles's choosing to present fairly brief testimony as to Card's difficult childhood. Green testified that in his opinion, emphasizing a client's deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct. We have found that counsel's sense of the reaction of the jury to certain types of testimony presents a sound basis on which to make tactical decisions. *See Foster v. Strickland,* 707 F.2d 1339, 1344 (11th Cir.

1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984) (in assessing counsel's performance, court may consider the fact that counsel felt that particular jury would respond more favorably to emotional appeal rather than complicated medical proof); *Gates v. Zant,* 863 F.2d at 1499 (in assessing failure to raise a defense, court may consider fact that counsel was concerned about the way jurors would react to jury discrimination challenge). In addition, curtailing direct testimony may foreclose harmful cross-examination. *See Adams v. Wainwright,* 709 F.2d 1443, 1446 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984) (decision to forego presenting evidence of defendant's background not unreasonable where counsel may have feared that if he presented evidence of positive aspects of background, state could have refuted it by calling attention to damaging evidence in the record); *Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987) (reasonable for attorney to assume that the presentation of good character evidence might motivate the state to introduce prior convictions). For all these reasons, we find that counsel was not ineffective for failing to have family members testify as to Card's background.

### C. Failure to Provide Information to Mental Health Experts

██ Card claims that Ingles was ineffective because he did not provide background materials to the appointed mental health experts, including information from Card's mother and sister. Specifically, Card claims that Dr. Hord, as well as the other mental health experts who examined Card, erred in failing to conclude that Card suffered from organic brain damage and schizophrenia, and that the cause of this error was counsel's failure to provide the experts with materials from which such a

---

across real good with the jury. We use Dr. Davidson a lot also. Dr. Davidson really gives us more of what we want, as far as reports, but he doesn't come across before a jury very good.

**19.** At the evidentiary hearing, Card presented extensive and highly detailed testimony in the form of affidavits from his mother, brother, and sister, describing the events of his childhood and youth.

diagnosis could be made. Card further claims that the conclusions of the experts, based on the information that *was* before them, were inadequate and reflected professional incompetence. He argues that had mental health experts been provided with the background information, and had they been competent, significant mental health mitigation would have been forthcoming.

Card claims that counsel was deficient in failing to provide the following types of evidence, among others, to the mental health experts: (1) school records demonstrating Card's academic difficulties and poor performance; (2) juvenile court records; (3) records from various correctional institutions where Card was incarcerated; (4) Army records; (5) medical records from a medical center in Nevada; and (6) records from a VA hospital in Nevada. He further claims that counsel should have provided the experts with more detailed information from family members.

Assuming arguendo that counsel did not in fact obtain these materials and provide them to the mental experts,[20] we find that his failure to do so does not amount to deficient performance within the meaning of *Strickland.* At the time that Card's sentencing hearing took place, Ingles had at least the following information relating to Card's mental health: (1) a September 31, 1981 report from Dr. Berland, a psychologist, finding Card competent to stand trial and concluding that he was sane at the time of the offense and appeared to have known the difference between right and wrong; (2) a September 23, 1981 report from Dr. Cartwright, a psychologist, resulting from four hours of evaluation, detailing the results of psychological tests, concluding that Card suffers from sociopathic personality and behavior problems, but finding that he was competent to stand trial and that at the time of the alleged offense, he was not insane, but knew the difference between right and wrong; (3) two written reports from October 10, 1981 and November 26, 1981, from Dr. Wray finding the defendant competent to stand trial, detailing aspects of his background, including his criminal record, violence, and infliction of self injury; and (4) one oral report from Dr. Wray concerning his interview with Card's parents and other information later contained in the January 27, 1982 letter. In addition, Dr. Hord himself conducted his own examination of Card, administered various tests, talked with family members, and consulted with Ingles before testifying at the penalty hearing.

There is no indication that the experts felt incapable of basing their conclusions on the information they obtained through their own testing and examinations. Nor is there any reason that, after receiving the experts' reports, counsel was obligated to track down every record that might possibly relate to Card's mental health and could affect a diagnosis. The reports of four mental health experts were unanimous in their conclusion that Card had been sane at the time of the offense, and one report specifically discounted the existence of schizophrenia. Thus, counsel was not on notice that further investigation was warranted. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066 (counsel may make reasonable decision that makes particular investigations unnecessary); *Foster,* 823 F.2d at 407 (where counsel has no cause to suspect that additional medical evidence would lead him to reassess his conclusion, counsel's decision not to pursue additional medical evidence was reasonable); *Funchess v. Wainwright,* 772 F.2d 683, 689 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986) (same).

Finally, it is unclear that, even had these materials been provided to experts, their evaluations of Card would have differed. In support of his claim that these materials would have led the experts to a diagnosis of schizophrenia and organic brain damage, Card relies heavily on the testimony of

---

**20.** It is unclear whether any of these records were before counsel. In his November 26, 1981 letter to Judge Turner, Dr. Wray stated, however, that "[i]t has been difficult to obtain all of the voluminous records, but I now have examined most of them." He further stated that he had received partial VA records.

psychologist Dr. Carbonell at the evidentiary hearing, who concluded, on the basis of her own tests and review of these materials, that Card suffered from these illnesses. While this may be one possible conclusion, it is not the only reasonable diagnosis that could be made from the information contained in the materials.

Although records from the Nevada hospital reflect a history of head trauma and headaches, tests performed there in 1972 and 1975, including x-rays, a brain scan, and an EEG proved normal. The psychiatrist's report accompanying Card's discharge from the Army in 1965 diagnosed Card as having an emotionally unstable personality but stated that Card displayed no evidence of "neurotic, psychotic or organic mental illness." The accompanying report described Card's behavior in a manner completely consistent with Dr. Hord's diagnosis of a personality disorder.

Dr. Carbonell also concluded that the mental health examinations that had been done by Doctors Berland, Cartwright, and Wray, even without additional materials, were inadequate and not in keeping with professional standards. A psychologist's assessment in hindsight that another expert's testing methods and conclusions were inadequate does not, standing alone, demonstrate that counsel's performance at the penalty phase of trial was unreasonable within the meaning of *Strickland*. *See Daugherty v. Dugger*, 839 F.2d at 1432 (mere fact that an expert who would give favorable testimony for Daugherty was discovered five years after sentencing proceedings is not sufficient to prove that a reasonable investigation at the time of sentencing would have produced same expert or another expert willing to give the same testimony). In this case, Dr. Hord diagnosed Card as having a sociopathic personality, and testified to the presence of two mitigating factors based on this diagnosis. Card's argument appears to be that it would have been more helpful had Dr. Hord informed the jury that Card was suffering from brain damage and schizophrenia instead of informing them that he was a sociopath. In *Elledge v.*

*Dugger*, however, we made clear that "counsel is not required to 'shop' for a psychiatrist who will testify in a particular way." 823 F.2d 1439, 1447 n. 17 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988). Dr. Hord's testimony was based on his professional assessment of Card's mental health. The fact that this assessment was not sufficient to cause the jury to recommend a life sentence or to cause the judge to find the presence of mitigating factors does not mean that counsel was ineffective.

Card states that this case is indistinguishable from *Harris v. Dugger*, 874 F.2d 756 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988); *Stephens v. Kemp*, 846 F.2d 642 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988); *Armstrong v. Dugger*, 833 F.2d 1430 (11th Cir. 1988); and *Magill v. Dugger*, 824 F.2d 879 (11th Cir.1987), all cases in which this court has found counsel's performance at the penalty phase of trial to fall outside the scope of reasonable professional assistance. We find these cases easily distinguishable.

In *Harris*, the defense presented *no* evidence in mitigation at the penalty phase. 874 F.2d at 759. Further, the testimony of Harris's two lawyers indicated that neither of them had performed any investigation in advance for the penalty hearing, each thinking that the other was responsible for that phase of the trial. The court thus concluded that "counsel's failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect." *Id.* at 763. "Thus, prior to the day of sentencing, neither lawyer had investigated Harris' [sic] family, scholastic, military and employment background, leading to their total—and admitted—ignorance about the type of mitigation evidence available to them." *Id.* Likewise, in *Middleton*, we determined that resentencing was required where trial counsel's lack of investigation resulted in the failure to uncover "an overwhelming amount of documentary mitigating evidence." 849 F.2d at 493. As in *Harris*, counsel in *Middleton* failed to introduce *any* evidence of defendant's

background at sentencing, despite the existence of medical records showing that the defendant suffered from schizophrenia, a childhood of neglect, and mental illness. *Id.* at 494. The court further concluded that this failure was not the result of counsel's valid tactical reasoning, as counsel testified that he did not know of the existence of psychiatric records and that his failure to seek them out was not the result of trial strategy. *Id.* In *Armstrong* and *Stephens,* preparation for the penalty phase was similarly extremely limited.[21]

This court has held that "[t]he key aspect of the penalty trial is that the sentence be individualized, focusing on the particularized characteristics of the individual." *Thomas v. Kemp,* 796 F.2d 1322 (11th Cir. 1989) (citing *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). We determine that Ingles's use of Dr. Hord at the penalty phase allowed the jury to make an individualized determination, and that Ingles filled his role of "ensur[ing] that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Because we conclude that counsel's performance was not deficient, we do not reach the question of whether Card has demonstrated prejudice.

### III. *Disallowance of the Testimony of Camille Cardwell.*

 As discussed in Section I.A. above, the defense proffered at trial the testimony

of Camille Cardwell that she had heard three men planning a crime similar to the crime for which Card was convicted. The trial court excluded her testimony as hearsay. Card argues that the exclusion of this testimony was in violation of his sixth, eighth, and fourteenth amendment rights as set out in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

We agree with the district court that Card's reliance upon *Chambers* is misplaced. In *Chambers,* the Court held that due process requirements supersede application of state hearsay rules, and that where testimony contains sufficient indicia of reliability and directly affects the ascertainment of guilt or innocence, the strict application of the hearsay rule cannot be employed to disallow the evidence.

In *Chambers* itself, defense counsel sought to introduce testimony by three witnesses who would have testified that another individual, McDonald, had confessed to committing the murder for which defendant Chambers was being tried. Two confessions were given by McDonald on the same night of the shooting, and one was given the next day. Although the trial court granted the motion requiring McDonald to appear at trial, it did not allow Chambers to examine McDonald on the ground that he was not a true adverse witness. *Id.* at 292, 93 S.Ct. at 1044. In

---

**21.** In *Armstrong,* counsel's sole preparation consisted of a brief discussion, after the liability phase, with defendant's parole officer. 833 F.2d at 1433 n. 2. In *Stephens,* we found counsel's performance deficient where, in preparation for the penalty phase, counsel conducted no inquiry into the possibility of presenting evidence of the defendant's mental history and conditions in mitigation of punishment, despite his knowledge that the defendant had spent time in a mental hospital shortly before the shooting. Counsel then failed to explain the relevance of mitigation, elicited by the trial judge, that was presented to the jury through the testimony of the defendant's mother.

*See also Magill v. Dugger,* 824 F.2d 879, 889 (11th Cir.1987) (psychiatrist who testified had never been asked by defense to examine defendant regarding applicability of statutory mitigat-

ing circumstances); *Elledge v. Dugger,* 823 F.2d 1439, 1445 (11th Cir.1987) (total failure to investigate possible witnesses professional and lay where mitigation is client's sole defense); *Thomas v. Kemp,* 796 F.2d 1322, 1324 (11th Cir.), *cert. denied,* 479 U.S. 996, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986) (little or no attempt to obtain mitigating evidence); *Thompson v. Wainwright,* 787 F.2d 1447, 1452 (11th Cir.1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987) (failure to conduct any investigation of defendant's background); *Tyler v. Kemp,* 755 F.2d 741, 744 (11th Cir.), *cert. denied,* 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985) (no evidence introduced by either party at sentencing phase); *King v. Strickland,* 748 F.2d 1462 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985) (failure to present additional available character witnesses as mitigating evidence not strategy decision).

ruling that Chambers should have been allowed to introduce the hearsay testimony of the three witnesses to whom McDonald had confessed, the Court focused on the reliability of the out-of-court statements. It pointed to four factors to be considered in assessing reliability: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against a declarant's penal interest; and (4) the availability of the declarant as a witness, that is, whether the state could cross-examine him regarding his statements. *Id.* at 300–01, 93 S.Ct. at 1048–49.

In this case, the statements purportedly overheard by Cardwell were made several weeks before the crime occurred. Although the statements were against the declarants' penal interests, there was no showing that the declarants were unavailable. We agree with the district court that although there was some evidence corroborating Cardwell's testimony, this evidence was insufficient to show that the statements were reliable.

In *Cikora v. Dugger,* 840 F.2d 893 (11th Cir.1988), we noted that "[f]ederal courts have granted relief from state convictions when the trial court arbitrarily excluded evidence tending to show that another person might have committed the crime. They have done so, however, only when there was some demonstration connecting another person to the particular crime for which the defendant was on trial." *Id.* at 898. The decision of whether the exclusion of testimony amounts to a denial of fundamental fairness violative of the due process clause requires a balancing of interests:

> The defendant certainly has a strong interest in presenting exculpatory evidence, but the state has an interest in promoting reliable trials, particularly in preventing the injection of collateral issues into the trial through unsupported speculation about the guilt of another party. Due process may require a trial court to allow the introduction of evidence of another party's possible guilt

when there is some showing of a nexus between the other party and the particular crime with which a defendant is charged.

*Id.* (footnote omitted). We conclude that here Card has not shown a sufficient nexus between the statements overheard by Cardwell and the crime for which Card was charged. Therefore, the district court did not err in denying relief based upon the exclusion of Cardwell's testimony as inadmissible hearsay.

## IV. Jurisdiction of the State Trial Court

### A. Background

Although the offense in this case was committed in Bay County, Florida, in the Fourteenth Judicial Circuit, and the indictment was returned against Card by a grand jury of that county, Card moved for a change of venue on grounds of prejudicial pre-trial publicity. Card's motion was granted and the case was moved to Okaloosa County, in the adjacent First Circuit. Despite the change of venue, Judge Turner, a judge in the Fourteenth Judicial Circuit, continued to preside over the case. The trial proceeded as scheduled in Okaloosa County. Following the conclusion of the penalty phase, the case was returned to Bay County where Judge Turner sentenced the defendant. At no point during these proceedings did defense counsel contend that any jurisdictional defect existed, nor did Card raise such a claim on direct appeal.

In Card's motion for post-conviction relief pursuant to Rule 3.850 and his petition for habeas corpus, Card alleged that Judge Turner, a Fourteenth Circuit judge, lacked authority to conduct a trial in the First Judicial Circuit absent an order of temporary assignment from the Chief Justice of the Florida Supreme Court. As a result, Card contends that the First Judicial Circuit was without jurisdiction to hear the case because trials conducted in the First Circuit must be conducted by a judge authorized to preside in that circuit.

In affirming the trial court's denial of post-conviction relief, the Florida Supreme Court found that Turner had *not* been au-

thorized to preside over the case because he had failed to procure a temporary assignment from the Chief Justice of the Florida Supreme Court pursuant to article V, section 2 of the Florida Constitution and Florida Rule of Judicial Administration 2.030(a)(3)(A). *Card,* 497 So.2d at 1172. The court concluded, however, that a technical flaw in assignment does not strip a circuit court of subject matter jurisdiction over a cause which is expressly conferred by law. Thus, the First Judicial Circuit had subject matter jurisdiction over the cause, as Section 26.012(2)(d) provides that circuit courts shall have jurisdiction over all felony trials. The court then considered whether Judge Turner's failure to obtain a temporary assignment rendered his judgment void or voidable. It stated that objections to a *void* judgment may be lodged at anytime whereas objections to *voidable* judgments must be made immediately. *Id.* at 1173. It held that:

A circuit court judge who follows a transferred case outside of the circuit without obtaining an order of temporary assignment from the Chief Justice presides over the case as a de facto judge. Actions taken by a de facto judge are merely voidable and not void. Thus, the failure to timely object to Judge Turner's administrative oversight constitutes waiver.

*Id.*

The court further noted that the concept of a de facto judge is well established in Florida law, that Judge Turner fit squarely within such a concept, and that the requirement of a timely objection to the authority of a de facto judge is clearly established under Florida law, and is based on sound public policy considerations. *See Sawyer v. State,* 94 Fla. 60, 113 So. 736 (1927). Finally, it noted that Card had failed to establish any prejudice from the lack of a technically proper assignment, as he never questioned Judge Turner's objectivity at either the guilt or sentencing phase of the trial. *Card,* 497 So.2d at 1174. It concluded that "Card's failure to object to Judge Turner's authority to preside over his case constitutes waiver of that issue" and that all orders signed by Judge Turner in the First Judicial Circuit were therefore valid. *Id.*

### B. Procedural Bar

Card contends that the district court erred in finding that this consideration of his claim on federal habeas review was barred under the procedural default rule enunciated in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

 A state court's rejection of a federal constitutional claim on procedural grounds will only bar consideration of that claim on federal habeas if the state court's ruling rests on independent and adequate state grounds. *County Court of Ulster County v. Allen,* 442 U.S. 140, 148, 99 S.Ct. 2213, 2220, 60 L.Ed.2d 777 (1979); *Wainwright v. Sykes,* 433 U.S. at 87, 97 S.Ct. at 2506. A state court finding of waiver or procedural bar constitutes an independent and adequate state ground if certain conditions are fulfilled. First, under *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) the last state court rendering a judgment in the case must fulfill the "plain statement rule" of *Michigan v. Long,* 463 U.S. 1032, 1042 & n. 7, 103 S.Ct. 3469, 3477 & n. 7, 77 L.Ed.2d 1201 (1983) and "clearly and expressly" state that it is relying on waiver as a ground for rejecting the petitioner's claim. *Harris,* 489 U.S. at 263, 109 S.Ct. at 1043. Second, the procedural rule relied on by the state court must serve as an independent state law ground for denying relief, and may not be intertwined with an interpretation of federal law. *Caldwell v. Mississippi,* 472 U.S. 320, 328, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985); *Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985). Finally, the state's application of procedural bar must be adequate. That is, it must not be applied in an arbitrary or unprecedented fashion, such that it thwarts federal court review of those who, "in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights." *NAACP v. Alabama ex rel Patterson,* 357 U.S. 449, 457–58, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488 (1958).

Instead, a state court's procedural rule must be faithfully and regularly applied, *see Dugger v. Adams,* 489 U.S. 401, — n. 6, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989); *Johnson v. Mississippi,* 486 U.S. 578, 586, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988) and must not be manifestly unfair in its treatment of a petitioner's federal constitutional claim. *Spencer v. Kemp,* 781 F.2d 1458, 1470–71 (11th Cir.1986).

Card concedes that the state court found his claim to be procedurally barred. He argues, however, that the bar was not independent because it was intertwined with the court's disposition of the claim on the merits. That is, the state court's determination of whether or not his challenge to jurisdiction was timely depended on its determination of whether Judge Turner was acting as a de facto judge, and, consequently, whether Judge Turner's decisions were void or voidable.

It is clear, however, that the procedural bar asserted by the state court was not intertwined with the court's interpretation of *federal* law, but was instead based on an examination of the state court rules governing objections to administrative irregularities. The state court could not determine the question of waiver without examining the nature of Judge Turner's authority under Florida law.[22] Thus, that inquiry simply formed a part of its explanation for finding the claim waived. *Cf. Ake v. Oklahoma,* 470 U.S. at 75, 105 S.Ct. at 1092 (judgment does not rest on independent state ground where state has made application of procedural bar depend on an antecedent ruling on federal law).

Card next argues that the application of procedural bar was inadequate because it had never before been announced, and had been applied against no other similarly situated litigant in the Florida state courts. Florida has given ample support for its application of procedural bar in this case, however, and such an application is in ac-

cordance with state law. *See White v. State,* 446 So.2d 1031, 1034 (Fla.1984); *State v. King,* 426 So.2d 12, 14 (Fla.1982); *Haddock v. State,* 129 Fla. 701, 176 So.782 (1937). Thus, the state's bar has not been used in a manner that is arbitrary, irregular, or manifestly unfair.

Notwithstanding a state's valid application of procedural bar, a federal court may nevertheless entertain a petitioner's claim if the petitioner shows cause for noncompliance with the state's procedural rule and prejudice resulting therefrom. *Wainwright v. Sykes,* 433 U.S. at 87, 97 S.Ct. at 2506. Under *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), ineffective assistance of counsel may constitute cause for procedural default. Here, we hold that the petitioner has failed to show that trial counsel was ineffective for failing to object to Judge Turner's presiding over the trial despite the flaw in assignment. The Florida Supreme Court indicated that had trial counsel objected, the Supreme Court would have issued the order of temporary assignment, thereby curing any default. *Card,* 497 So.2d at 1173. Counsel cannot be deemed ineffective for failing to raise a defect in jurisdiction which could and would have been immediately cured by an administrative action of the Florida Supreme Court. Accordingly, we affirm the district court's finding that this claim is procedurally barred.

## V. Pretrial Competency Hearing and Competence to Stand Trial

Card contends that his constitutional rights were abridged by the state trial court's failure to afford him a pre-trial competency hearing. He further claims that he was in fact incompetent to stand trial and that the district court erred in failing to hold an evidentiary hearing on this claim.

**22.** Card argues extensively that the Florida Supreme Court erred in holding that Judge Turner was acting as a de facto judge and claims that in reaching such a conclusion, the Florida court arbitrarily refused to apply its own law. Regardless of the merit of Card's contentions, it is

settled law that this court "may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984); *Carrizales v. Wainwright,* 699 F.2d 1053 (11th Cir.1983).

In *Dusky v. United States*, the Court stated that the test for competency to stand trial is "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has rational as well as factual understanding of the proceedings against him." 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). The Supreme Court has made clear that the conviction of an accused person while he is legally incompetent violates due process. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966) (citing *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956)). Furthermore, under *Pate v. Robinson*, a defendant's due process rights are violated if the state trial court does not afford him an adequate hearing on the question of competency "whenever the trial judge becomes aware of a bona fide doubt concerning that defendant's competence." *Zapata v. Estelle*, 588 F.2d 1017, 1020 (5th Cir.1979); [23] *see Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir.1987).

### A. The State Court's Failure to Conduct a Hearing.

The district court determined that the state trial court did not err in failing to conduct an evidentiary hearing on the issue of competency. In reaching this conclusion, however, the district court relied on an improper legal standard. To decide whether a state trial court was required to conduct a hearing on a defendant's competence to stand trial, the reviewing court must "focus on what the trial court did in light of what it then knew." *Fallada*, 819 F.2d at 1568. This requires consideration of three factors: "(1) evidence of the defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial." *Id; see Drope v. Missouri*, 420 U.S. 162, 172–73, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). A hearing is only required if these factors, taken together, were sufficient to raise a bona fide

doubt as to the defendant's competency. *Fallada*, 819 F.2d at 1568.

In its order, the district court did not set out the legal standard as enunciated by this court in *Zapata* and *Fallada*. Instead, it set out the standard that a federal court is to use in deciding whether a defendant is entitled to an evidentiary hearing when a substantive claim of incompetency is raised *in a request for post-conviction relief.* In *Fallada*, we made clear that:

> [t]he issue of whether the state trial court should have conducted an evidentiary hearing on the defendant's competence is distinct from the issue whether the defendant was in fact competent to stand trial. The latter issue can be raised through a request for post-conviction relief even when a bona fide doubt of competency is not raised at trial. When the issue of competence to stand trial (as against the issue of the right to a hearing on competency) is raised in a request for post-conviction relief the burden on the defendant is higher.

819 F.2d at 1567–68 n. 1 (citations omitted).

The "higher burden" of a defendant raising the issue of incompetency in federal habeas was described in *Bundy v. Dugger* as follows:

> A defendant is not entitled to an evidentiary hearing on his claim of incompetency unless he "presents clear and convincing evidence to create a 'real, substantial and legitimate doubt as to [his] mental capacity ... to meaningfully participate and cooperate with counsel....'" *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir.1985), *cert. denied*, [474] U.S. [1073], 106 S.Ct. 834, 88 L.Ed.2d 805 (1986) (quoting *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir.1973)). "The standard of proof is high. The facts must 'positively, unequivocally and clearly generate' the legitimate doubt." *Id.*

816 F.2d 564, 566 (11th Cir.), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). The district court erroneously set

---

**23.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

forth this "higher burden" in determining whether a *Pate* violation had occurred.

 Despite setting forth the improper legal test, the district court correctly followed *Fallada*'s requirement that the focus be on the information before the state trial court and that the reviewing court look to three factors in determining whether a *Pate* violation has occurred.

The district court first looked to the medical reports before Judge Turner. It noted that when Judge Turner ordered Card competent to stand trial in October of 1981, he had before him the reports of Drs. Berland and Cartwright, who had examined Card in September of 1981, pursuant to Card's request for an examination by a mental health expert. Dr. Berland gave a very positive report of Card's mental state at the time of trial, concluding that he was competent to stand trial. Dr. Cartwright found that the defendant manifested a sociopathic personality and had behavior problems, but concluded that he would be capable of performing tasks relevant to his trial. After these two reports, the trial judge found Card competent to stand trial. Nonetheless, the trial judge granted Card's motion for a third examination by Dr. Wray, a forensic psychiatrist. Dr. Wray concluded an initial report of October of 1981, by suggesting "a remote possibility of insanity ... and diminished capacity, warranting further evaluation upon receipt of medical records." In a final report, issued after trial was over, Dr. Wray reported that there was no indication of paranoid schizophrenia or of delusions, and concluded that Card was competent to stand trial.

The district court also noted that Card's ability to participate in his defense was further illustrated by two incidents that arose prior to trial. First, Card brought his own pro se motion before trial seeking to dismiss defense counsel for their alleged refusal to interview two witnesses. Second, shortly before trial, defendant engaged in an intelligent colloquy with the trial judge regarding aspects of his case. The district court concluded that "these demonstrations by defendant substantiate the conclusions of Drs. Berland, Cart-

wright and Wray that defendant was knowledgeable of the proceedings before him and capable of consulting with his attorneys and preparing for his defense." Order at 20.

Although the district court employed the incorrect legal standard, its factual findings regarding the evidence before the state trial court judge are well supported by the record. Thus, we have no difficulty in concluding that the "objective facts known to the trial court were [not] sufficient to raise a bona fide doubt as to the defendant's competency." *Fallada*, 819 F.2d at 1568. We thus affirm the district court's holding that the trial court did not err in failing to conduct a competency hearing.

**B. Card's Competency to Stand Trial**

 Card also claims that he was in fact incompetent to stand trial and that the district court erred in failing to conduct an evidentiary hearing on this claim. In our discussion above, we have already set forth the *Bundy* court's articulation of the high burden placed on a defendant who seeks to challenge his competency in post-conviction proceedings. In order to be entitled to an evidentiary hearing in district court on a competency claim, the defendant must present facts sufficient to "unequivocally and clearly" generate a substantial doubt as to mental capacity.

 The district court did not address Card's actual competency to stand trial apart from its discussion of whether the state trial court should have held a competency hearing. Although the district court concluded, in the context of Card's *Pate* claim, that Card did not meet the *Bundy* standard of raising a legitimate doubt as to his competency, we are concerned that in reaching this determination, the district court erroneously limited itself to the evidence of competency before the state trial court.

Card claims that the mental health experts who evaluated him before and during trial failed to conduct an adequate evaluation of his competency to stand trial. He claims that none of the experts who exam-

ined him sought out or considered information relating to his substantial history of mental and emotional difficulties. Furthermore, they failed to conduct professionally adequate testing. This resulted in serious deficiencies in the mental health evaluations conducted at the time of trial. In support of these assertions, Card points to the 1986 and 1987 reports of Doctors Smith and Carbonell received into evidence by the district court.[24] Both reports point out the inadequacies in the mental health evaluations conducted at trial. Dr. Carbonell concluded that Card was in fact incompetent to stand trial. Card also points to a 1986 letter of Dr. Berland, recognizing errors with regard to that doctor's own 1981 competency evaluation.

The district court's order makes no mention of Dr. Carbonell's and Dr. Smith's reports, nor does it address Card's assertions regarding the inadequacy of the evaluations performed by the experts appointed to examine him. Because we are unsure whether the district court considered this additional evidence in concluding that Card had failed to raise a legitimate doubt as to his competency, we cannot determine whether the court erred in failing to hold an evidentiary hearing on this claim. See Bundy v. Dugger, 816 F.2d at 566 (reviewing evidence on which district court relied in failing to hold an evidentiary hearing). We thus remand for the district court to set forth its reasons for failing to hold an evidentiary hearing on Card's claim of incompetency.

## VI. Ineffective Assistance of Appellate Counsel

Card alleges that his appellate counsel was ineffective for failing to raise two issues on direct appeal: (1) the trial court's lack of jurisdiction; and (2) the trial court's failure to conduct a hearing pursuant to Richardson v. State, on an alleged state discovery violation.[25]

Card's ineffective assistance claim relating to appellate counsel's failure to challenge jurisdiction was raised in his first state habeas petition. His ineffective assistance claim relating to the Richardson hearing was raised for the first time in his second state habeas petition. The Florida Supreme Court found the second claim barred by Card's failure to raise it in his first habeas petition. It stated that where an initial motion for post-conviction relief raises an ineffective assistance claim, the court may deny a successive motion which raises additional grounds for ineffective assistance of counsel if those grounds were known and could have been raised earlier.

With respect to appellate counsel's failure to challenge jurisdiction, we agree with the Florida Supreme Court that Card cannot demonstrate that his counsel's performance was deficient under Strickland. Card's trial counsel did not object to Judge Turner's jurisdiction, and the Florida Supreme Court has made clear that, under state law, any objection made after trial would have been deemed untimely and thus denied. See Card, 497 So.2d at 1177. Counsel cannot be labeled ineffective for failing to raise issues which have no merit. See Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir.1987) (evaluating likelihood of success on claim in assessing deficiency of counsel); see also Cross v. United States, 893 F.2d 1287, 1290 (11th Cir.1990) (assessing the likelihood of appellate counsel's success on the merits of claim under prejudice prong of Strickland).

With respect to appellate counsel's failure to raise the claim concerning the denial of a Richardson hearing, we affirm the

---

**24.** In addition, both of these witnesses offered testimony, in the context of Card's ineffective assistance of counsel claim, as to the alleged inadequacies of the evaluations conducted by the prior experts.

**25.** In Richardson v. State, 246 So.2d 771 (Fla. 1971) the Florida Supreme Court held that if the state fails to comply with a discovery rule, the court must conduct an inquiry into the circum-

stances of the violation. Here, the alleged discovery violation concerned the state's failure to inform defense counsel that it would offer testimony regarding the fact that powersteering fluid was found in the road near the victim's body and that Card's car was leaking fluid. The trial judge overruled the defense's objection to the admission of the testimony, but did not order a Richardson hearing.

district court's holding that Card has failed to demonstrate cause for failure to raise the claim in his first state habeas petition, and thus the claim is procedurally barred.

### VII. Hitchcock Violation

Card claims that the district court erred in failing to find any mitigating circumstances and in failing to consider evidence of nonstatutory mitigating circumstances in violation of *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

Card contends that unrebutted testimony at the penalty phase of his trial, presented through the testimony of Dr. Hord, established the existence of two mitigating circumstances recognized under Fla.Stat. § 921.141(6)(b) and (f): that he was under the influence of extreme mental or emotional disturbance at the time of the offense, and that his ability to conform his conduct to the requirements of law was substantially impaired at the time of the offense.

In his sentencing report, the trial judge found that Dr. Hord's testimony was insufficient to establish the existence of either of these statutory mitigating circumstances. This finding was affirmed by the Florida Supreme Court. *Card,* 453 So.2d at 24. Card argues that in light of the mental health expert's testimony, the trial court's finding that there were no statutory mitigating circumstances was without basis.

■■■ We do not reach the question of whether the state court's finding of no mitigating circumstances was fairly supported by the record,[26] because the trial judge also made clear that even if he found mitigation under section 921.141(b) and section 921.141(f), "that would not outweigh the overwhelming evidence of aggravating circumstances prevalent in the testimony."

"[A] federal habeas corpus court will not re-evaluate the *weight* accorded to particular aggravating and mitigating factors. This determination is left to state courts, providing the death penalty statute and sentencing hearings meet relevant constitutional requirements." *Magwood v. Smith,* 791 F.2d 1438, 1449 (11th Cir.1986) (emphasis in original). *See Ford v. Strickland,* 696 F.2d 804, 818 (11th Cir.) (en banc), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983) (process of weighing circumstances is a matter for judge and jury and is not susceptible to proof by either party). As we find that Card's sentencing hearing suffered from no constitutional infirmity,[27] we will not reweigh the aggravating and mitigating factors found by the state court.

Card next contends that the trial judge failed to consider evidence of nonstatutory mitigating circumstances in violation of *Hitchcock v. Dugger.* In *Hitchcock,* the Supreme Court invalidated a Florida death sentence where the advisory jury was instructed not to consider and the sentencing judge refused to consider evidence of nonstatutory mitigating circumstances, finding that the sentencing did not comport with the requirements of *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). 481 U.S. at 397, 107 S.Ct. at 1824.

Card argues that post-*Hitchcock* sentencing proceedings will violate the eighth amendment not only if they evince an affirmative preclusion of nonstatutory mitigating evidence, but also if they fail to reflect that a full consideration was given to nonstatutory mitigating factors independent of statutory factors. He states that the judge's sentencing report shows that mental health mitigation was considered

---

**26.** Card points to *Magwood v. Smith,* 791 F.2d 1438 (11th Cir.1986), in which this court held that the trial court and Alabama Supreme Court erred in rejecting two mental condition mitigating factors identical to those put forth by Card, as not fairly supported by the record. *Id.* at 1450.

**27.** See our discussion of Card's claim of ineffective assistance of trial counsel at the penalty phase in Section II above and our discussion of Card's claim of *Hitchcock* error in this section.

only in terms of the statutory criteria, and that the trial judge afforded no consideration to the mental health evidence that it deemed insufficient to fall within the statute's strict technical standards.

■ We agree with Card that the trial judge did not make specific mention of nonstatutory mitigating factors in his sentencing report. Further, the trial court's sentencing report contains a sentence similar to that which, in *Messer v. State,* 834 F.2d 890 (11th Cir.1987), we found "clearly [indicated] that the judge examined the psychological evidence only for the purpose of determining whether Messer's problems satisfy the statutory requirement of extreme mental or emotional disturbance." *Id.* at 894.[28] Here, the trial court stated:

> The Court has taken into account the testimony of Dr. Hord and finds that the defendant is apparently a sociopathic personality. It is contended that this testimony establishes that the defendant was under extreme mental or emotional disturbance at the time of the commission of the offense and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The Court finds, however, that the testimony of Dr. Hord does not establish any particular mitigating circumstances.

Lack of reference in a sentencing report to nonstatutory mitigating circumstances is not, however, standing alone, sufficient evidence of a *Hitchcock* violation to justify relief. *Parker v. Dugger,* 876 F.2d 1470, 1475 & n. 7 (11th Cir.1989), *cert. granted,* — U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990); *Johnson v. Wainwright,* 806 F.2d 1479, 1484 n. 8 (11th Cir.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987).

■ In ruling on an alleged *Hitchcock* error, this court reviews the record on a case-by-case basis, matching the record in the case under consideration with that in *Hitchcock,* and looking to the totality of the circumstances. *See Delap v. Dugger,* 890 F.2d 285, 304 (11th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990); *Demps v. Dugger,* 874 F.2d 1385, 1389 (11th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1834, 108 L.Ed.2d 963 (1990); *Knight v. Dugger,* 863 F.2d 705, 708 (11th Cir.1988). This requires consideration not only of the sentencing report, but also of the trial judge's instructions to the jury; any statements by the prosecutor, defense counsel or judge reflecting an understanding as to whether nonstatutory mitigating circumstances may be considered; remarks by the prosecutor or defense counsel to the jury in opening or closing arguments; and, if relevant, the Florida Supreme Court's statements in reviewing the sentencing decision of the trial court.

■ Thus, in *Hargrave v. Dugger,* 832 F.2d 1528, 1534–35 (11th Cir.1987) (en banc), *cert. denied,* — U.S. ——, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989), this court found a *Hitchcock* violation where the jury instructions, comments by the judge to counsel, comments by the prosecutor, and sentencing order clearly reflected the court's belief that the jury and sentencing judge could only look to those mitigating circumstances enumerated in the statute. Similarly, in *Messer,* the court found that resentencing was required where, aside from the sentencing order, the prosecutor's opening and closing statements, a colloquy between the defense counsel and the court, and the court's instructions to the jury, indicated that the judge and jury considered only statutory mitigating factors. 834 F.2d at 893–95.

Here, a consideration of the relevant factors convinces us that there has been no *Hitchcock* violation. During the charge conference, comments by the defense coun-

---

**28.** In *Messer,* the state trial court's sentencing report stated that:

> In making this finding [that no mitigating circumstances are present], the Court has considered the testimony of two clinical psychologists and a psychiatrist who testified, none of whom diagnosed the Defendant to have been suffering any extreme mental or emotional disturbance at the time of the commission of the offense.

834 F.2d at 894.

sel, prosecutor, and judge made clear that they all understood that nonstatutory mitigating circumstances could be considered. In his closing argument, the prosecutor told the jury that "[t]he defense has a catch-all under the mitigating circumstances that says, 'We give you some specific ones, and then you can use anything else you can come up with.'" Defense counsel also informed the jury that there could be unlimited consideration of any nonstatutory mitigation offered by the defendant during the penalty phase. In addition, the instructions to the jury informed them that in deciding on the proper penalty, the jury could consider, aside from the two statutory mitigating circumstances for which the defendant had presented evidence, "[a]ny other aspect of the defendant's character or record, or any other circumstance of the offense." Finally, while the sentencing order did not specify a finding of the presence or absence of nonstatutory mitigating circumstances, unlike in *Hargrave* and *Messer*, the judge did not state that he had only reviewed those mitigating factors spelled out in the statute,[29] but rather stated that he had considered and weighed "all the evidence in the case."

In sum, "these factors indicate the court's awareness of the rule in *Lockett* and persuade us that when the judge stated in his order that in imposing the sentence of death, he had considered 'all the evidence,' he considered evidence of nonstatutory mitigating circumstances, as well as of statutory mitigating circumstances." *Daugherty v. Dugger,* 839 F.2d 1426, 1432 (11th Cir.1988). Accordingly, we affirm the district court's finding that no *Hitchcock* error occurred in this case.

**29.** *See Hargrave,* 832 F.2d at 1535; *Messer,* 834 F.2d at 894.

**30.** We note that the Supreme Court recently has decided that under the principles announced in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a petitioner whose conviction became final before the court's ruling in *Caldwell* may not rely on *Caldwell* to attack that conviction on federal habeas corpus review. *Sawyer v. Smith,* —— U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). Because *Sawyer* postdated the district court's decision, that court did

### VIII. Caldwell Violation

Card contends that the district court erred in denying relief for his claim based on *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).[30]

In *Caldwell,* the Supreme Court held that remarks by the prosecutor in a capital case that misinformed the jury as to the role of appellate review violated the eighth amendment. *Id.* at 336, 105 S.Ct. at 2634 (plurality opinion). In *Mann v. Dugger,* 844 F.2d 1446 (11th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989), this court held that *Caldwell* applies to Florida's capital sentencing scheme, reasoning that because Florida case law requires the trial court to give significant weight to the jury's recommendation, "the concerns voiced in *Caldwell* are triggered when a Florida sentencing jury is misled into believing that its role is unimportant." *Id.* at 1454 (footnote omitted). *See also Adams v. Wainwright,* 804 F.2d 1526, 1532 (11th Cir.1986), *modified,* 816 F.2d 1493 (11th Cir.1987), *reversed on other grounds,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (applying *Caldwell* to Florida's sentencing scheme).

▉▉▉ Card argues that relief is warranted under *Caldwell,* as the prosecutor misinformed the jury as to its role in sentencing and diminished the jury's sense of responsibility. We agree with the district court that this claim is procedurally barred.

*Caldwell* was decided by the Supreme Court on June 11, 1985. Card's first state petition for habeas corpus, filed on June 2, 1986, did not include a *Caldwell* claim. Card raised his *Caldwell* claim for the first time in his second state petition for habeas corpus filed on September 11, 1987. The

not rely on non-retroactivity when denying relief on this claim. The Supreme Court has stated that the rule of *Teague* is not jurisdictional in the sense that a court "*must* raise and decide the issue *sua sponte.*" *Collins v. Youngblood,* —— U.S. ——, ——, 110 S.Ct. 2715, 2716, 111 L.Ed.2d 30 (1990) (emphasis in original). Because the district court did not address retroactivity and because the state has not raised it before this court, we choose to dispose of this claim on the grounds relied upon by the district court.

Florida Supreme Court did not reach the merits of Card's claim, holding that a *Caldwell* claim was available to Card at the time he filed his first petition, and "[t]herefore, a second petition filed after *Caldwell* which raises this issue for the first time constitutes an abuse of the writ. *See Raulerson v. Wainwright*, 753 F.2d 869 (11th Cir. 1985)." *Card*, 512 So.2d at 831.

Card claims that the Florida court's reliance on abuse of the writ does not constitute an independent state ground precluding federal review because the state's application of abuse of the writ was based on an antecedent ruling of federal law, that is, the Florida court's perception that *Caldwell* does not apply to Florida's sentencing scheme. We disagree. The Florida Supreme Court did not base its holding on the inapplicability of *Caldwell*. Instead, it focused on the fact that *Caldwell* was available to Card in 1986 and that the intervening Eleventh Circuit decisions in *Adams* and *Mann* did not constitute a change of law "sufficient to merit a subsequent postconviction challenge to a final conviction and sentence." *Card*, 512 So.2d at 831. In support of this position, the Florida court did not rely on an interpretation of federal law, but rather on the case of *Witt v. State*, 387 So.2d 922 (Fla.), *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980) in which the Florida Supreme Court stated that an alleged change of law will not be considered grounds for post-conviction relief unless the change not only involves a constitutional development of fundamental significance, but also emanates from the Florida Supreme Court or the United States Supreme Court. *Id.* at 931. As *Mann* and *Adams* emanated from an intermediate federal court, they do not fit that description. This ruling constitutes an independent and adequate state ground on which to bar review of Card's *Caldwell* claim.

We now examine whether Card has demonstrated cause and prejudice for counsel's failure to raise the *Caldwell* claim in his first state habeas petition. Our inquiry as to "cause" is guided by *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, in which the Supreme Court held that, prior to *Cald-*

*well*, Florida petitioners had the basis, under *state* law, for an objection at trial and argument on appeal that the prosecutor's and/or trial judge's remarks to the jury misled the jury as to its role in the sentencing process. This is because "the ground for challenging the trial judge's instructions—that they were objectionable under state law—was a necessary element of the subsequently available *Caldwell* claim. In such a case, the subsequently available federal claim does not excuse the procedural default." 489 U.S. at ——, 109 S.Ct. at 1217 (footnote omitted). *See also Clark v. Dugger*, 901 F.2d 908, 914 (11th Cir.1990) (finding no cause for failure to object to *Caldwell*-type error).

Although *Dugger v. Adams* concerned the failure to object at trial or raise the argument on appeal, the reasoning of that case applies *a fortiori* to a failure to object at a state collateral proceeding. Florida Rule of Criminal Procedure 3.850 provides that the motion does not authorize relief "based upon grounds which could have or should have been raised at trial, and, if properly preserved, on direct appeal of the judgment and sentence." *See Cave v. State*, 529 So.2d 293, 296 (Fla.1988). We thus find that Card cannot make a showing of cause for counsel's failure to raise his *Caldwell* claim in his first state habeas petition.

We further hold that this is not an extraordinary case, in which principles of fundamental justice allow a "federal habeas court [to] grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. at 495–96, 106 S.Ct. at 2649. In *Dugger v. Adams*, the Supreme Court made clear that in the context of a *Caldwell* error, a "fundamental miscarriage of justice" does not occur even where the trial judge found an equal number of aggravating and mitigating circumstances. 489 U.S. at —— n. 6, 109 S.Ct. at 1217–18 n. 6. Here, the trial judge found five aggravating circumstances and no mitigating circumstances. *See Card*, 453 So.2d at 23–24 (upholding trial judge's finding of aggravating factors). In such a case, we cannot

say that any alleged error that diminished the jury's sense of its sentencing responsibility resulted in a fundamental miscarriage of justice. *See Clark v. Dugger,* 901 F.2d at 915 (quoting *Clark v. State,* 379 So.2d 97, 104 (Fla.1979)) (no fundamental miscarriage of justice where there remain several aggravating circumstances to support the imposition of the death penalty). Because Card cannot surmount the state procedural bar that precludes him from asserting his *Caldwell* claim in federal collateral proceedings, we affirm the district court's denial of relief on this ground.

### IX. Conclusion

For the foregoing reasons, the district court's denial of the petition for a writ of habeas corpus is AFFIRMED as to all claims other than claim V relating to Card's competency to stand trial. As to claim V, we REMAND for the limited purpose of allowing the district court, within sixty days, to set forth its reasons for failing to hold an evidentiary hearing on that claim.